**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFIT FUNDS, Individually and on Behalf of All Others Similarly Situated, | Case No.: 16-CV-02400 |
| | **CLASS ACTION** |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **DEMAND FOR JURY TRIAL** |
| BRIXMOR PROPERTY GROUP INC., MICHAEL CARROLL, MICHAEL PAPPAGALLO, AND STEVEN SPLAIN, | |
| Defendants. | |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ....................1

II. JURISDICTION AND VENUE ....................5

III. PARTIES ....................5

IV. SUBSTANTIVE ALLEGATIONS ....................7

A. Background of the Company ....................7

B. Defendants' Materially False and Misleading Statements....................7

C. The Truth Is Revealed....................17

D. Defendants' False Statements Regarding NOI were Material....................19

E. Defendants' Misstatements Regarding NOI Violated SEC Regulations and Basic Accounting Tenets ....................21

V. CLASS ACTION ALLEGATIONS ....................22

VI. UNDISCLOSED ADVERSE FACTS....................25

VII. LOSS CAUSATION....................26

VIII. SCIENTER ALLEGATIONS....................27

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ....................28

X. NO SAFE HARBOR ....................29

XI. COUNTS AGAINST DEFENDANTS....................30

COUNT I ....................30

COUNT II ....................33

XII. PRAYER FOR RELIEF ....................35

XIII. JURY TRIAL DEMANDED....................35

Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Brixmor Property Group Inc. ("Brixmor" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Brixmor's website concerning the Company's public statements; and (d) review of other publicly available information concerning Brixmor and the Individual Defendants.

## I. NATURE OF THE ACTION

1. This is a class action on behalf of all persons or entities that purchased or otherwise acquired Brixmor securities between October 27, 2014 and February 5, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Brixmor is a publicly-traded real estate investment trust (REIT) that operates a wholly-owned portfolio of grocery-anchored community and neighborhood shopping centers, with 518 properties located from California to Maine, including retailers such as the TJX Cos Inc. and The Kroger Co.

3. As a REIT, Brixmor's performance and financial health are analyzed by examining certain performance metrics that are of specific importance to the real estate industry.

In contrast to traditional companies, which are valued on earnings per share or book value, REITs are often valued using alternative performance metrics, including funds from operations (FFO), adjusted funds from operations (AFFO), and/or NOI.[1] The rationale for employing these alternative valuation methodologies is tethered to the fact that real estate is purchased in the private sector based on cash flow streams generated from the asset, not on Generally Accepted Accounting Principles ("GAAP"), earnings or historical book values.

4. NOI, in particular, is a performance metric designed for commercial real estate investors. Every financial analysis performed for a cash-flowing property includes an NOI figure, which helps to demonstrate how much real cash flow is available to pay the mortgage and other costs on the property. NOI is crucial because it impacts property market values, financing costs and a host of other holding period decisions. Lenders are particularly conscious of NOI because they want to ensure that the investor is able to meet its monthly mortgage obligations.

5. Brixmor itself touted NOI as an important and useful non-GAAP financial measure of its financial performance, and acknowledged that NOI was a key performance metric that was closely followed by investors and analysts alike. In its 2014 Form 10-K, Brixmor stressed that its "management uses Same Property NOI to review operating results for comparative purposes with respect to previous periods or forecasts, and also to evaluate future prospects."

6. Analysts echoed the importance of NOI as a financial performance metric that was highly indicative of Brixmor's business strength and stability. For example, in a March 16, 2015 *seekingalpha.com* article, an analyst highlighted the principle that one of the three

[1] NOI is the cash flow generated at a specific property, excluding corporate-level expenses. NOI is calculated by taking property level revenue and subtracting property-level expenses (real estate taxes, operating expenses, and marketing expenses). Same property NOI measures NOI on a static number of properties to give insight as to how a portfolio of assets performs over a period of time.

"catalysts support[ing] the argument that Brixmor is a stock worth owning" is that it "has demonstrated solid operating metrics with continued momentum forecasted. The company ***has reported 10 consecutive quarters of same property NOI growth in excess of 3.5%***."[2]

7. Given the emphasis and scrutiny that the investing community has placed on NOI, Brixmor and its management were very concerned about achieving consistent NOI growth on a quarterly basis. To that end, Brixmor's top executives embarked on an intentional scheme to "smooth" the Company's financial results from quarter to quarter in order to deliver this desired consistency in the growth of its NOI.

8. On February 8, 2016, Brixmor disclosed that the Company and certain high level executives had engaged in a fraudulent scheme whereby they were "smoothing" the Company's NOI numbers. In a Form 8-K filed with the SEC on this same date, Brixmor admitted that "specific Company personnel, in certain instances, were directly involved and/or supervised persons directly involved in smoothing income items between reporting periods in a manner contrary to GAAP in an effort to achieve consistent quarterly same property net operating income growth, an industry non-GAAP financial measure."

9. The February 8, 2016 press release from Brixmor also disclosed the resignations of several key high-level executives: Chief Executive Officer Michael Carroll; President and Chief Financial Officer Michael Pappagallo; and Chief Accounting Officer Steven Splain. These resignations were effective immediately.

10. In reaction to these shocking disclosures, Brixmor's stock plummeted $5.32 per share from $26.42 per share on Friday, February 5, 2016, to $21.10 per share on Monday, February 8, 2016—a significant decline of over 20% on unusually heavy trading volume of 21

[2] http://seekingalpha.com/article/3002436-i-just-bought-a-high-quality-reit-with-a-sound-margin-of-safety

million shares. Brixmor's stock price drop as a result of these revelations wiped out nearly $1.6 billion in the Company's market capitalization in one trading day.

11. On February 11, 2016, a *MarketWatch* article entitled "Executive bonuses at issue in Brixmor's admission of altered results" noted that performance bonuses may have motivated the Company's executives to manipulate Brixmor's financial results. The article highlighted that a measure used to trigger incentive bonuses called "cash net operating income" was one of three quantitative performance metrics used to determine the level of bonuses for executives. Notably, Defendants Carroll, Pappagallo and Splain were each awarded bonuses for ***exactly*** meeting the targeted $2.79 per share NOI measure in 2014.

12. As further detailed below, throughout the Class Period, Defendants made false and/or misleading statements, and/or failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company and its senior executives purposefully smoothed income items for nine quarters in order to achieve consistent quarterly same property NOI growth; (2) the Company lacked adequate internal and financial controls; and (3) that, as a result of the foregoing, Defendants' statements about Brixmor's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

13. As a direct result of Defendants' wrongful actions, Brixmor's common stock traded at artificially inflated prices throughout the Class Period.

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

17. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). A substantial portion of the acts in furtherance of the alleged fraud, including the effects of the fraud, have occurred in this Judicial District. In addition, the Company's principal executive offices are located within this Judicial District.

18. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

19. Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds, as set forth in the accompanying certification, incorporated by reference herein, purchased Brixmor common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

20. Defendant Brixmor Property Group Inc. is a Maryland corporation with its principal executive offices located at 450 Lexington Avenue, New York, NY 10017.

21. Defendant Michael Carroll ("Carroll") was, at all relevant times, Chief Executive Officer ("CEO") of Brixmor. On February 8, 2016, the Company announced that Carroll had resigned from his position effective immediately.

22. Defendant Michael Pappagallo ("Pappagallo") was, at all relevant times, President and Chief Financial Officer ("CFO") of Brixmor. On February 8, 2016, the Company announced that Pappagallo had resigned from his position effective immediately.

23. Defendant Steven Splain ("Splain") was, at all relevant times, Chief Accounting Officer of Brixmor. On February 8, 2016, the Company announced that Splain had resigned from his position effective immediately.

24. Defendants Carroll, Pappagallo, and Splain are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Brixmor's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

25. Brixmor, a publicly-traded REIT, owns and operates a portfolio of grocery-anchored community and neighborhood shopping centers, with 518 properties, aggregating approximately 87 million square feet of gross leasable area, located primarily across the top 50 U.S. metro markets. Headquartered in New York City, the Company is the largest landlord to The TJX Companies and The Kroger Company.

### B. Defendants' Materially False and Misleading Statements

26. Throughout the Class Period, Brixmor's press releases, investor presentations and public filings made with the SEC included material misstatements and/or omissions concerning the Company's financial results, which included consistently touting that its NOI growth was "strong, resilient and consistent." These false and misleading statements created a false impression concerning Brixmor's business and operational status and future growth prospects.

27. Brixmor has admitted that "Company accounting and financial reporting personnel, in certain instances, were smoothing income items, both up and down, between reporting periods in an effort to achieve consistent quarterly same property net operating income ('same property NOI') growth, an industry non-GAAP financial measure."[3] Moreover, contrary to the Company's representations, Brixmor failed to maintain adequate internal and public disclosure controls.

28. Throughout the Class Period, Brixmor represented that same property NOI was a useful non-GAAP financial measure of its financial performance:

> Same property NOI is a supplemental, non-GAAP financial measure utilized to evaluate the operating performance of real estate companies and is frequently used by securities analysts, investors and other interested parties in understanding

[3] BRX Press Release, "Brixmor Property Group Names Daniel Hurwitz Interim CEO" (Feb. 8, 2016).

> business and operating results regarding the underlying economics of our business operations. It includes only the net operating income of properties owned for the full period presented, which eliminates disparities in net income due to the acquisition or disposition of properties during the period presented, and therefore provides a more consistent metric for comparing the performance of properties. Management uses Same Property NOI to review operating results for comparative purposes with respect to previous periods or forecasts, and also to evaluate future prospects.[4]

29. Defendants also misleadingly stated that it had calculated same property NOI as follows:

> (using properties owned as of the end of both reporting periods and for the entirety of both periods excluding properties classified as discontinued operations), as rental income (minimum rent, percentage rents, tenant recoveries and other property income) less rental operating expenses (property operating expenses, real estate taxes and bad debt expense) of the properties owned by us. Same Property NOI excludes corporate level income (including transaction and other fees), lease termination income, straight-line rent and amortization of above- and below-market leases of the same property pool from the prior year reporting period to the current year reporting period.[5]

**<u>Third Quarter 2014 Financial Results</u>**

30. On October 27, 2014, the first day of the Class Period, the Company released its results for the third quarter ended September 30, 2014 ("3Q 2014"), disclosing, in pertinent part:

> ***Favorable activity continued in the third quarter of 2014 with same property NOI increasing 3.9%, the ninth consecutive quarter of growth over 3.5%, and strong leasing results.*** As a result of Brixmor's operational expertise, new lease volume exceeded 1.0 million square feet again in the quarter. In addition, blended rent spreads increased to 13.9%, the highest on record for the Company post initial public offering. Funds from operations per diluted share increased 9.3% over the 2013 third quarter. Additionally, reflective of the Company's continued revenue growth, the Board of Directors increased the Company's dividend by 12.5 percent.

31. Defendant Carroll commented on the Company's financial results, stating in pertinent part:

> "The Company is performing extremely well both operationally and financially.

---

[4] BRX 2014 Form 10-K at 48 (Feb. 19, 2015).
[5] BRX 2014 Form 10-K at 48 (Feb. 19, 2015).

> Same property NOI growth and active balance sheet management continue to drive our earnings growth. The dividend increase is reflective of our strong performance[.]"

32. On October 28, 2014, Brixmor held a conference call with analysts and investors to discuss the Company's 3Q 2014 results. During the conference call, Defendant Carroll stated, in pertinent part:

> ***Our success thus far is evident in the results we have reported since becoming a public company. We delivered strong same property NOI growth of 3.9% in the quarter. Importantly this is off strong comps in third quarter 2013 when we reported 3.5% growth. We have now achieved same property NOI growth in excess of 3.5% for the ninth consecutive quarter.***

33. During the call, Defendant Pappagallo emphasized the growth of the Company's same property NOI:

> Our third quarter financial results again demonstrate the strong internal growth profile of the portfolio that is sourced from the opportunities afforded below market in place rents, improved mechanized mix driving higher asking rents and continued favorable tight supply conditions in the market.
>
> ***A host of operating metrics support this view including over 9% FFO growth for both the quarter and nine months, same property NOI growth approaching 4%,*** double digit leasing spreads once again and 5% cash adjusted EBITDA growth. This momentum and the opportunities to increase cash flow through further investment in our existing asset base drove the decision to increase our quarterly dividend by 12.5%.

34. On November 4, 2014, the Company filed its Form 10-Q for 3Q 2014, which was signed by the Individual Defendants, certified by Defendants Carroll and Pappagallo, and reiterated Brixmor's previously reported financial results, including:

> ***Same Property NOI increased $7.5 million or 3.9% for the three months ended September 30, 2014, as compared to the same period in 2013***, primarily due to (i) a $6.0 million increase in rental income driven by an increase in billed occupancy to 90.8% from 90.3% and (ii) an increase in the expense recovery percentage to 87.1% from 86.1% driven by increased occupancy of our portfolio. In addition, there was a decrease in roof and parking lot repairs and maintenance expenses.

* * *

> ***Same Property NOI increased $22.0 million or 3.8% for the nine months ended September 30, 2014, as compared to the same period in 2013***, primarily due to (i) a $19.5 million increase in rental income driven by an increase in billed occupancy to 90.8% from 90.3% and (ii) an increase in the expense recovery percentage to 86.8% from 85.1% driven by increased occupancy of our portfolio coupled with reconciliation income due to year end billings. These increases were partially offset by increased weather related expenses including snow removal expenses, utility expenses, roof and parking lot repairs and maintenance expenses.

35. In addition, the 3Q 2014 Form 10-Q (and each of Brixmor's subsequent quarterly and annual reports filed with the SEC described herein) contained certifications signed by Defendants Carroll and Pappagallo pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting that the financial information contained in the filing was true, did not omit material facts, and that the Company's internal and disclosure controls were effective.

36. For example, Defendants Carroll and Pappagallo certified in the 3Q 2014 Form 10-Q (and each of Brixmor's subsequent quarterly and annual reports filed with the SEC described herein) that:

> [T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

37. With respect to Brixmor's reported financial information, Defendants Carroll and Pappagallo certified in the 3Q 2014 Form 10-Q that:

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

38. With respect to Brixmor's internal controls, Defendants Carroll and Pappagallo certified in the 3Q 2014 Form 10-Q (and each of Brixmor's subsequent quarterly and annual

reports filed with the SEC described herein) that they were personally: (i) responsible for establishing and maintaining disclosure controls and procedures; (ii) designed or caused Brixmor's controls or procedures to be designed to ensure that material information relating to Brixmor and its consolidated subsidiaries was made known to them by others within those entities; (iii) designed or caused Brixmor's controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (iv) evaluated the effectiveness of the Brixmor's disclosure controls and procedures, and presented in Brixmor's quarterly and annual filings their conclusions about the effectiveness of the disclosure controls and procedures.

**Fourth Quarter 2014 Financial Results**

39. On February 9, 2015, Brixmor released its results for the fourth quarter and year ended December 31, 2014, disclosing, in pertinent part:

> Operating metrics continued their positive trajectory in the fourth quarter of 2014 with healthy leasing results and ***same property NOI increasing 3.9%, the tenth consecutive quarter of growth over 3.5%.*** Total rent spreads increased to 13.9%, the sixth consecutive quarter of spreads over 11.0%, and were 12.6% for the year. Funds from operations per diluted share increased 7.1% over 2013. Additionally, the Company's operating partnership, Brixmor Operating Partnership LP (the "Operating Partnership"), received investment grade ratings from Standard & Poor's Ratings Services and Fitch Ratings during the quarter.

40. Defendant Carroll commented on the Company's financial results, stating in pertinent part:

> "Our strong performance during the quarter and the year reflects our embedded growth opportunity as we continue to harvest the below market leases throughout our portfolio and reposition our properties with best-in-class anchors. ***We produced strong operating and financial results in the fourth quarter, led by same property NOI growth and rent spreads approaching 14% for the second consecutive quarter. The investments that we are making in the portfolio continue to provide cash flow growth[.]***"

41. On February 10, 2015, the Company held a conference call to discuss its financial results for the fourth quarter of 2014, wherein Defendant Carroll emphasized the Company's NOI growth:

> Strong leasing results throughout the year have successfully boosted our tenant mix, average base rent and occupancy rates. ***Driving our continued organic growth with same property NOI of 3.9% in both the fourth quarter and year. This marks the 10th consecutive quarter of same property NOI growth in excess of 3.5%. No other sector peer can make this statement.*** We expect to continue to drive strong NOI growth in the 2015, as we capitalize on the long-term opportunity embedded within our portfolio.

42. On February 19, 2015, Brixmor filed its annual report for the year ended December 31, 2014 with the SEC. The 2014 Form 10-K, which was signed by the Individual Defendants and reiterated Brixmor's previously reported financial results, stated:

> ***Same Property NOI increased $29.6 million or 3.9% for the year ended December 31, 2014***, as compared to the same period in 2013, primarily due to (i) a $25.3 million increase in rental income driven by an increase in billed occupancy to 91.3% from 90.8%, and (ii) an increase in the expense recovery percentage to 87.0% from 84.9% driven by increased occupancy of our portfolio partially offset by (iii) increased weather related expenses including snow removal expenses, utility expenses, roof and parking lot repairs and maintenance expenses.

43. The 2014 Form 10-K represented that those financial results were accurate and presented in accordance with GAAP. The 2014 Form 10-K also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The 2014 Form 10-K included Defendants Carroll and Pappagallo's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶35.

**<u>First Quarter 2015 Financial Results</u>**

44. On April 27, 2015, Brixmor released its financial results for the first quarter ended March 31, 2015 ("1Q 2015"), disclosing, in pertinent part:

> ***Same property net operating income ("same property NOI") increased 3.4%***, notwithstanding a 40 basis point negative impact related to proactive remerchandising activities, including the Company's previously announced early termination of certain Kmart leases and other recapturing of space.

45. Defendant Carroll commented on the Company's financial results, stating, in pertinent part:

> "Our small shop occupancy gains and strong rent growth this quarter reflect our ongoing progress in our Raising the Bar efforts, which are focused on repositioning our properties with best-in-class anchors, and the corresponding impact on our leasing productivity. These efforts continue to drive organic growth, while also providing for long-term improvements in our cash flow and asset values[.]"

46. Also, on April 27, 2015, the Company filed its Form 10-Q for 1Q 2015, which was signed by the Individual Defendants and reiterated Brixmor's previously reported financial results:

> ***Same Property NOI increased $7.1 million or 3.4% for the three months ended March 31, 2015, as compared to the same period in 2014,*** primarily due to an increase in ABR from same store properties and an increase in expense recovery percentage from 86.7% in 2014 to 87.8% in 2015.

47. The 1Q 2015 Form 10-Q represented that those financial results were accurate and presented in accordance with GAAP. The 1Q 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting. The 1Q 2015 Form 10-Q included Defendants Carroll and Pappagallo's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶35.

48. On April 28, 2015, Brixmor held a conference call with analysts and investors to discuss 1Q 2015 financial results. During the call, Defendant Carroll emphasized the consistent growth in same property NOI:

> ***Same property NOI grew nicely at 3.4% right down the middle of our full year guidance range and reflective of strong rent spread and a slight occupancy uplift versus a year ago despite the elevated downtime from our repositioning activity.***
>
> * * *
>
> This is a wow opportunity and unlike others in the sector, all upside with minimal downside risk. As I've said before, this is a long run way given the structure of our expiry schedule in the maturity of our assets. ***As a result of these ongoing gains and rents, we delivered same property NOI growth of 3.4%, of note, over 80% of the change in same property NOI was from rent growth, indicative of our ability to grow cash flow while at the same time repositioning our portfolio for the long-term.***

**<u>Second Quarter 2015 Financial Results</u>**

49. On July 27, 2015, the Company released its results for the second quarter ended June 30, 2015 ("2Q 2015"), disclosing, in pertinent part:

> Same Property NOI
>
> ***Same property NOI for the three months ended June 30, 2015 increased 3.6% from the comparable 2014 period*** due to growth in rental income driven by strong leasing spreads as the Company continues to harvest the below-market leases inherent in its portfolio, as well as from operating expense savings.
>
> ***Same property NOI for the first six months of 2015 increased 3.5% from the comparable 2014 period.***

50. Defendant Carroll commented on the Company's financial results, stating, in pertinent part:

> "With new lease ABR per square foot of $15.89, 29% above in-place rents, and rent spreads accelerating the past twelve months to reach over 16% this quarter, our investment proposition has never been more apparent. Our same property net operating income ("same property NOI") growth of 3.6% underscores our outstanding internal growth and the significant mark-to-market opportunity in our portfolio. When combined with our Raising the Bar efforts, we are driving healthy operating fundamentals, with small shop occupancy gaining 150 basis points year-over-year and 40 basis points sequentially[.]"

51. Also, on July 27, 2015, the Company filed its Form 10-Q for 2Q 2015, which was signed by the Individual Defendants and reiterated Brixmor's previously reported financial

results:

> ***Same Property NOI increased $7.5 million or 3.6% for the three months ended June 30, 2015, as compared to the same period in 2014***, primarily due to an increase in ABR from same store properties and an increase in expense recovery percentage from 86.9% in 2014 to 87.9% in 2015.
>
> * * *
>
> Same Property NOI increased $14.6 million or 3.5% for the six months ended June 30, 2015, as compared to the same period in 2014, primarily due to an increase in ABR from same store properties and an increase in expense recovery percentage from 86.8% in 2014 to 87.9% in 2015.

52. The 2Q 2015 Form 10-Q represented that those financial results were accurate and presented in accordance with GAAP. The 2Q 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting. The 2Q 2015 Form 10-Q included Defendants Carroll and Pappagallo's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶35.

53. On July 28, 2015, Brixmor held a conference call with analysts and investors to discuss 2Q 2015 financial results. During the call, Defendant Carroll asserted:

> We like to say we have built-in growth and through our raising-the-bar efforts utilizing best-in-class anchors to drive rent gains in NAV improvement, we're maximizing that opportunity. ***Third, we're an NOI and earnings growth story. Same property NOI growth which was 3.6% this quarter and 3.5% year-to-date, will continue to reflect a larger portion of rent growth, with occupancy gains on the margin coming mainly from small shops as we rotate our anchors to best-in-class.*** Simply put, we're growing cash flow while at the same time repositioning our portfolio for the long term.

54. During the call, Defendant Pappagallo added:

> Same property NOI accelerated from last quarter, reaching 3.6%, the consequence of higher rental income from improved lease rates, a product of our raising-the-bar initiative and better-than-expected tenant retention which reduced downtime, as well as lower operating expenses and bad debt provisions.

**Third Quarter 2015 Financial Results**

55. On October 26, 2015, the Company released its results for the third quarter ended September 30, 2015 ("3Q 2015"), disclosing, in pertinent part:

> Same Property NOI
>
> Same property NOI for the three months ended September 30, 2015 increased 3.6% from the comparable 2014 period due to growth in rental income driven by strong leasing spreads as the Company continues to harvest the below-market leases inherent in its portfolio.
>
> Same property NOI for the first nine months of 2015 increased 3.5% from the comparable 2014 period.

56. Defendant Carroll commented on the Company's financial results, stating in pertinent part:

> "Our operating performance continues to demonstrate the internal growth opportunity embedded within our portfolio, and when combined with our Raising the Bar efforts, drives value creation within the Brixmor enterprise. The ongoing transformation of our portfolio is evident in our results with same property net operating income ("same property NOI") growing 3.6%, our new lease ABR per square foot at $16.35, 29% above in-place rents and rents spreads healthy at 15%. The dividend increase continues to track our earnings growth[.]"

57. Also, on October 26, 2015, the Company filed its Form 10-Q for 3Q 2015, which was signed by the Individual Defendants and reiterated Brixmor's previously reported financial results, stating:

> Same Property NOI increased $7.7 million or 3.6% for the three months ended September 30, 2015, as compared to the same period in 2014, primarily due to an increase in ABR from same store properties and an increase in expense recovery percentage from 86.5% in 2014 to 87.3% in 2015.
>
> * * *
>
> Same Property NOI increased $22.3 million or 3.5% for the nine months ended September 30, 2015, as compared to the same period in 2014, primarily due to an increase in ABR from same store properties and an increase in expense recovery percentage from 86.7% in 2014 to 87.7% in 2015.

58. The 3Q 2015 Form 10-Q represented that those financial results were accurate

and presented in accordance with GAAP. The 3Q 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting. The 3Q 2015 Form 10-Q included Defendants Carroll and Pappagallo's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶35.

59. On October 27, 2015, the Company held a conference call with analysts and investors to discuss 3Q 2015 financial results. During the call, Defendant Pappagallo represented:

> Last quarter, I began my prepared remarks using the wor[d] consistency to describe our financial results and I'm pleased to be able to use that word again. Our same property NOI growth remains strong, resilient and consistent.
> Year-to-date NOI growth was 3.5%, a quarterly rate of 3.6% and an overall average of 3.9% over the past three years ***with every quarter at least 3.4% underlies that consistency***. And the components of NOI growth reflect the benefits of the Raising the Bar initiatives.
>
> * * *
>
> Based on the nine months results, our same property NOI levels have moved to the high end of the original range even considering the 40 basis points drag from the Kmart and related repositioning.

60. During the earnings call, Defendant Carroll added:

> By adding best-in-class anchors, we are driving higher sales and traffic and elevating the appeal of our centers while stimulating small shop leasing. And most importantly, as a result of this anchor space rotation, we are increasing rent levels and same property NOI creating measurable value. Our results since IPO has certainly proven this.

**C. The Truth Is Revealed**

61. On February 8, 2016, Brixmor disclosed that the Company and certain high level executives engaged in a fraudulent scheme whereby it was "smoothing" its NOI numbers. In a Form 8-K filed on this date, Brixmor stated that:

> specific Company personnel, in certain instances, were directly involved and/or supervised persons directly involved in smoothing income items between reporting periods in a manner contrary to GAAP in an effort to achieve consistent quarterly same property net operating income growth, an industry non-GAAP financial measure.

62. The Company's February 8, 2016 press release also disclosed the resignations of several key high-level executives: Chief Executive Officer Michael Carroll; President and Chief Financial Officer Michael Pappagallo; and Chief Accounting Officer Steven Splain. The resignations were effective immediately.

63. In reaction to these troubling disclosures, Brixmor's stock price plummeted almost 20% on heavy volume, wiping out nearly $1.6 billion in market capitalization in one day. That same day, Moody's downgraded $1.2 billion of Brixmor's debt securities, stating that the revision was in reaction to Brixmor's recent announcement. Additionally, S&P threatened to cut Brixmor's rating to junk, noting that the improper reporting of non-GAAP same-property net operating income in some periods may affect Brixmor's cost of capital or operating performance due to the turnover of its management team. Brixmor was also downgraded by a host of investment research firms, as shown in the table below:[6]

| Firm | Action | Rating |
|---|---|---|
| Boenning Scattergood | Downgrades | Outperform -> Neutral |
| Deutsche Bank | Downgrades | Buy -> Hold |
| JPMorgan Chase & Co. | Downgrades | Overweight -> Underweight |
| RBC Capital | Downgrades | Outperform -> Underperform |
| Sandler O'Neill | Downgrades | Buy -> Hold |
| Stifel Nicolaus | Downgrades | Buy -> Hold |
| SunTrust | Downgrades | Buy -> Neutral |
| Wells Fargo | Downgrades | Outperform -> Market Perform |

64. Analysts were stunned. On February 11, 2016, a *MarketWatch* article entitled "Executive bonuses at issue in Brixmor's admission of altered results" noted that performance

[6] http://www.marketbeat.com/ratings/downgrades/2016-2-8/

bonuses may have motivated the Company's executives to manipulate Brixmor's financial results. The article highlighted that a measure used to trigger incentive bonuses called "cash net operating income" was one of three quantitative metrics used to determine bonuses for the Company's executives. Of note, Defendants Carroll, Pappagallo and Splain were each awarded bonuses for ***exactly*** meeting the targeted $2.79 per share NOI measure in 2014.

**D. Defendants' False Statements Regarding NOI were Material**

65. Brixmor has admitted that the Company's representations concerning its NOI during the Class Period were false and misleading. In connection with Brixmor's disclosures, Defendants attempted to downplay the NOI manipulation by representing that "the amounts involved were not material to non-GAAP same property NOI or the Company's GAAP financial results." Although the resulting misstatements of the Company's same property NOI may not be quantitatively large, the misstatements are undoubtedly qualitatively material.

66. Indeed, immediately following Brixmor's stunning revelations, analysts in near-unison decried the intentional misconduct on the part of the Company's executives. For instance, an analyst at Sandler O'Neill & Partners LP immediately downgraded Brixmor's shares, and noted that these executives "risk[ed] everything to fudge" the Company's numbers. Similarly, analysts at Standard & Poor's put Brixmor's credit rating on watch for a cut to below investment grade, citing the possibility that additional infractions may come to light. Other analysts voiced doubt concerning Brixmor's characterization of the impact of the misconduct. For example, a Vice President at Audit Analytics stated: "This is the first case that I've seen where an accounting issue is supposedly immaterial to GAAP [and] is potentially material to the non-GAAP results."

67. The analyst speculation concerning the materiality of the accounting fabrications

is actually rooted in the accounting literature itself. For instance, according to the SEC's Staff Accounting Bulletin ("SAB") Topic 1.M, among the considerations that may well render material a quantitatively small misstatement of a financial statement item includes "whether the misstatement masks a change in earnings or other trends." In this instance, Brixmor executives touted the "consistency" of the Company's NOI growth "over the past three years with every quarter at least 3.4%." As discussed above, these executives emphasized this consistency repeatedly to investors at every turn, and as reflected in the chart below, the executives successfully employed these "smoothing" machinations throughout the Class Period:

| | As Reported | As If Adjusted | Difference | |
|---|---|---|---|---|
| | Y-O-Y Change | Y-O-Y Change | Y-O-Y Change | $ |
| **2013** | | | | |
| Q3 2013 | 3.5% | 4.4% | 0.9% | $1.0 |
| Q4 2013 | 3.9% | 2.7% | -1.2% | ($2.1) |
| **Full Year 2013** | 4.0% | 3.9% | **-0.10%** | **($0.3)** |
| **2014** | | | | |
| Q1 2014 | 3.8% | 3.9% | 0.1% | $0.2 |
| Q2 2014 | 3.8% | 3.6% | -0.2% | ($0.3) |
| Q3 2014 | 3.9% | 3.1% | -0.8% | ($1.4) |
| Q4 2014 | 3.9% | 5.1% | 1.2% | $2.0 |
| **Full Year 2014** | 3.9% | 3.9% | **0.00%** | **$0.5** |
| **2015** | | | | |
| Q1 2015 | 3.4% | 3.4% | 0.0% | $0.0 |
| Q2 2015 | 3.6% | 4.1% | 0.5% | $1.1 |
| Q3 2015 | 3.6% | 3.3% | -0.3% | ($0.7) |
| **Q1-Q3 2015** | 3.5% | 3.6% | **0.1%** | **$0.3** |

68. Further, SAB Topic 1.M notes that:

> While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. ***The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings***.

69. In this respect, Brixmor has already admitted that senior executives intentionally misstated same property NOI.

**E. Defendants' Misstatements Regarding NOI Violated SEC Regulations and Basic Accounting Tenets**

70. From Q3 2013 through Q3 2015, Brixmor misstated its same property NOI, a non-GAAP financial measure[7] by improperly "smoothing income items, both up and down, between reporting periods in an effort to achieve consistent quarterly same property net operating income. . . ." During this time frame, Brixmor misleadingly stated that it calculated same property NOI as follows:

> (using properties owned as of the end of both reporting periods and for the entirety of both periods excluding properties classified as discontinued operations), as rental income (minimum rent, percentage rents, tenant recoveries and other property income) less rental operating expenses (property operating expenses, real estate taxes and bad debt expense) of the properties owned by us. Same Property NOI excludes corporate level income (including transaction and other fees), lease termination income, straight-line rent and amortization of above- and below-market leases of the same property pool from the prior year reporting period to the current year reporting period.

71. The SEC permits companies to present non-GAAP financial measures in their periodic reports filed under the Securities Exchange Act of 1934, subject to compliance with Regulation G.[8] Regulation G includes the following discussion regarding consistency of calculating and presenting non-GAAP financial measures:

---

[7] The SEC has promulgated regulations directly related to the disclosure of non-GAAP measures, such as same property NOI. Regulation G applies whenever a company publicly discloses or releases material information that includes a non-GAAP financial measure.

[8] http://www.sec.gov/rules/final/33-8176.htm

> [R]egistrants should consider whether a change in the method of calculating or presenting a non-GAAP financial measure from one period to another, without a complete description of the change in that methodology, complies with the requirement of Regulation G that a registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

72. The actions by Defendants further violated two of the basic tenets of accounting—consistency and comparability. Financial Accounting Standards Board ("FASB") Concepts Statement ("Concepts Statement") No. 6, paragraph 120 states that "[c]onsistency in applying accounting methods over a span of time has always been regarded as an important quality that makes accounting numbers more useful." Regarding comparability, Concepts Statement No. 6, paragraph 111 states that "[i]nformation about an enterprise gains greatly in usefulness if it can be compared . . . with similar information about the same enterprise for some other period or some other point in time."

73. Defendants, however, engaged in smoothing income items between reporting periods in a manner contrary to Regulation G and basic accounting tenets "in an effort to achieve consistent quarterly same property net operating income growth, an industry non-GAAP financial measure."

74. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## V. <u>CLASS ACTION ALLEGATIONS</u>

75. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or

otherwise acquired Brixmor securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Brixmor and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

76. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Brixmor's securities were actively traded on the New York Stock Exchange ("NYSE") (an open and efficient market) under the symbol "BRX." Millions of Brixmor shares were traded publicly during the Class Period on the NYSE. As of February 1, 2016, Brixmor had 299,153,127 shares of common stock outstanding. Record owners and the other members of the Class may be identified from records maintained by Brixmor and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

77. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

78. Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

79. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b) whether Defendants participated in and pursued the common course of conduct complained of herein;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Brixmor;

d) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Brixmor;

e) whether the market price of Brixmor common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

80. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. UNDISCLOSED ADVERSE FACTS

81. The market for Brixmor's securities was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and failures to disclose described herein, Brixmor's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Brixmor's securities relying upon the integrity of the market price of the Company's securities and market information relating to Brixmor, and have been damaged thereby.

82. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Brixmor's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

83. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Brixmor's financial well-being and prospects.

84. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VII. LOSS CAUSATION

85. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Brixmor's securities and operated as a fraud or deceit on Class Period purchasers of Brixmor's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Brixmor's securities fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Brixmor's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

86. By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Brixmor's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Brixmor to conceal the truth.

87. Defendants' false and misleading statements had the intended effect and caused Brixmor's common stock to trade at artificially inflated levels throughout the Class Period. The

stock price drop discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

88. The decline in the price of Brixmor's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Brixmor's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Brixmor's securities and the subsequent decline in the value of Brixmor's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII. SCIENTER ALLEGATIONS

89. As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

90. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Brixmor, their control over, receipt and/or modification of Brixmor's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Brixmor, participated in the fraudulent scheme alleged herein.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

91. At all relevant times, the market for Brixmor's securities was an efficient market for the following reasons, among others:

a) Brixmor securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b) As a regulated issuer, Brixmor filed periodic public reports with the SEC and the NYSE;

c) Brixmor securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d) Brixmor regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

92. As a result of the foregoing, the market for Brixmor's securities promptly digested current information regarding Brixmor from all publicly available sources and reflected such information in Brixmor's stock price. Under these circumstances, all purchasers of Brixmor's securities during the Class Period suffered similar injury through their purchase of Brixmor's securities at artificially inflated prices and a presumption of reliance applies.

93. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact

of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Brixmor's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X. NO SAFE HARBOR

94. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

95. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Brixmor who knew that the statement was false when made.

## XI. COUNTS AGAINST DEFENDANTS

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

96. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against all Defendants.

97. During the Class Period, Brixmor and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Brixmor securities; and (iii) cause Plaintiff and the other members of the Class to purchase Brixmor securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

98. These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Brixmor securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of Brixmor, as alleged herein.

99. In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate

truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

100. Brixmor and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Brixmor as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Brixmor's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Brixmor and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Brixmor's securities during the Class Period.

101. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual

Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

102. These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Brixmor's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

103. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Brixmor securities

was artificially inflated during the Class Period. In ignorance of the fact that the market price of Brixmor shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Brixmor securities during the Class Period at artificially inflated high prices and were damaged thereby.

104. At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Brixmor, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Brixmor securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

105. By virtue of the foregoing, Brixmor and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

107. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108. The Individual Defendants were and acted as controlling persons of Brixmor within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

109. In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

110. As set forth above, Brixmor and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as this Court deems appropriate.

## XIII. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 31, 2016

Respectfully Submitted,

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

*/s/ Curtis V. Trinko*
Curtis V. Trinko (CT-1838)
Jennifer E. Traystman (JT-7583)
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: (212) 490-9550
Facsimile: (212) 986-0158
Email: Ctrinko@trinko.com

***Liaison Counsel for Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds***

**SAXENA WHITE P.A.**
Joseph E. White, III (JW-9598)
Lester R. Hooker
5200 Town Center Circle
Suite 601

Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
jwhite@saxenawhite.com
lhooker@saxenawhite.com

***Counsel for Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds***

# CERTIFICATION AND AUTHORIZATION

I, Christine Costa, on behalf of the Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Local 60"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am authorized in my capacity as Fund Manager of Local 60 to initiate litigation on Local 60's behalf and to execute this Certification.

2. Local 60 did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. Local 60 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Local 60's transactions in Brixmor Property Group, Inc. common stock are set forth in the Schedule A attached hereto.

5. Local 60 has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re CenturyLink, Inc. Securities Litigation,* No. 3:14-cv-00658 (W.D. La.)

6. Local 60 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending: *None*

7. Local 60 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 60's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 24 day of March 2016.

Westchester Putnam Counties Heavy &
Highway Laborers Local 60 Benefit Funds

Christine P. Costa

Christine Costa, Fund Manager

**SCHEDULE A**
**Westchester Putnam Counties Heavy &**
**Highway Laborers Local 60 Benefit Funds**
***Transactions in Brixmor Property Group, Inc.***

**Beg. Hold.** 0

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 10/26/15 | 1,622 | $25.80 |
| 10/26/15 | 1,360 | $25.80 |
| 10/27/15 | 1,637 | $26.24 |
| 10/27/15 | 1,372 | $26.24 |
| 11/02/15 | 2,727 | $25.70 |
| 11/02/15 | 3,253 | $25.70 |
| 11/03/15 | 1,349 | $25.80 |
| 11/03/15 | 1,609 | $25.80 |
| 11/04/15 | 1,647 | $25.85 |
| 11/04/15 | 1,381 | $25.85 |
| 11/05/15 | 3,155 | $26.04 |
| 11/05/15 | 2,644 | $26.04 |
| 01/19/16 | 1,309 | $25.58 |
| 01/19/16 | 1,098 | $25.58 |
| 01/25/16 | 1,438 | $25.72 |
| 01/25/16 | 1,205 | $25.72 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 02/02/16 | 1,677 | $26.37 |
| 02/02/16 | 2,001 | $26.37 |