# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFIT FUNDS, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>    v.<br><br>BRIXMOR PROPERTY GROUP INC., MICHAEL CARROLL. MICHAEL PAPPAGALLO, AND STEVEN SPLAIN,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.:  1:16-cv-02400 (AT)(SN)<br><br>**CLASS ACTION**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... v

I.   SYNOPSIS OF THE FRAUD ............................................................................ 1

II.  JURISDICTION AND VENUE ......................................................................... 6

III. THE PARTIES .................................................................................................. 6

   A.   Lead Plaintiffs ...................................................................................... 6

   B.   Defendants ............................................................................................ 8

      1.   Brixmor ..................................................................................... 8

      2.   The Individual Defendants ........................................................ 9

IV.  OVERVIEW OF THE BRIXMOR FRAUD ..................................................... 11

   A.   Background of Brixmor ....................................................................... 11

      1.   Brixmor's Real Estate Business .............................................. 11

      2.   The Importance of Consistent Quarterly Same Property NOI
           Growth in Evaluating Brixmor's Operations ........................... 12

   B.   The Individual Defendants Repeatedly Touted Brixmor's Consistent
        Quarterly Same Property NOI Growth Throughout The Class Period ........ 15

   C.   The Individual Defendants Falsified Brixmor's Same Property NOI
        Growth .................................................................................................. 19

      1.   An Audit Committee Investigation Exposes The Individual
           Defendants' Fraud .................................................................... 19

      2.   Former Brixmor Employees Corroborate The Individual
           Defendants' Role In The Brixmor Accounting Fraud .............. 22

   D.   The Brixmor Fraud Caused Massive Losses To Investors ................... 25

      1.   Investor and Analyst Reaction To The Brixmor Fraud ............ 25

      2.   The SEC and the USAO for the SDNY Launch Investigations of
           Brixmor ..................................................................................... 29

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..................................................................................................30

    A.  Fourth Quarter 2013 Financial Results ................................................30

    B.  First Quarter 2014 Financial Results ...................................................33

    C.  May 2014 Global Retail Real Estate Convention ...............................35

    D.  June 2014 SPO....................................................................................36

    E.  Second Quarter 2014 Financial Results ..............................................36

    F.  September 2014 Barclays Global Financial Services Conference.........39

    G.  Third Quarter 2014 Financial Results .................................................40

        1.  November 2014 SPO ..............................................................42

        2.  December 2014 SPO ..............................................................42

        3.  January 2015 SPO .................................................................43

        4.  January 2015 Offering of 3.850% Senior Notes due 2025 .......43

    H.  February 2015 Devonshire REIT Symposium......................................44

    I.  Fourth Quarter 2014 Financial Results ...............................................45

    J.  March 2015 Citi Global Property CEO Conference .............................46

    K.  March 2015 SPO..................................................................................47

    L.  First Quarter 2015 Financial Results ...................................................48

    M.  June 2015 REITWeek NAREIT Investor Forum..................................48

    N.  Second Quarter 2015 Financial Results ..............................................49

    O.  August 2015 Offering of 3.875% Senior Notes due 2022 ....................50

    P.  September 2015 Bank of America Merrill Lynch Conference ...............51

    Q.  September 2015 Barclays Global Financial Services Conference.........52

    R.  Third Quarter 2015 Financial Results .................................................52

    S.  Defendants' False Statements Regarding Internal Controls .................54

VI.     BRIXMOR'S VIOLATIONS OF GAAP AND SEC REGULATIONS ...........................57

     A.     Defendants' Misstatements Violated SEC Regulations and GAAP ......................57

     B.     Brixmor's Ineffective Disclosure Controls and Internal Control Over Financial Reporting ................................................................................................61

     C.     Defendants' False Statements Concerning NOI Were Material ...........................63

VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..............................65

VIII.   LOSS CAUSATION....................................................................................................71

IX.     PRESUMPTION OF RELIANCE ...............................................................................72

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ..........................................................................73

XI.     CLASS ACTION ALLEGATIONS ...........................................................................74

XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT...........................................76

            COUNT I ...............................................................................................................76

            COUNT II ..............................................................................................................78

XIII.   PRAYER FOR RELIEF ..............................................................................................80

XIV.   JURY DEMAND ........................................................................................................80

## PRELIMINARY STATEMENT

Lead Plaintiffs City of Birmingham Retirement and Relief System ("Birmingham"), Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Local 60"), and Teamsters Local 456 Annuity Fund ("Local 456") (together, "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of their counsel.  Many of the facts related to Lead Plaintiffs' allegations are known only by Defendants, or are exclusively within Defendants' custody or control.  Lead Counsel's investigation included, among other things: (i) a review of public filings by Defendant Brixmor Property Group Inc. ("Brixmor" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) presentations, press releases, media and analyst reports made by or about the Company; (iii) transcripts of Brixmor's conference calls with analysts and investors; (iv) publicly available data relating to Brixmor securities; (v) interviews with former employees of the Company; (vi) consultations with relevant experts; and (viii) other materials and data concerning the Company.  Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery.

Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendant Brixmor and the Individual Defendants Michael Carroll, Michael Pappagallo and Steven Splain, and under Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired Brixmor's securities between February 20, 2014 through February 5, 2016 (the "Class Period"), including common stock, Operating Partnership (as defined below) 3.850% Senior Notes due 2025, and the 3.875% Senior Notes due 2022.

## I.     <u>SYNOPSIS OF THE FRAUD</u>

1.     The bedrock fact of this securities fraud class action is that Defendant Brixmor has now admitted that, for more than two full years, its most senior officers deliberately falsified one of the Company's most important publicly-reported financial metrics.   Specifically, throughout the Class Period, Defendants fraudulently manipulated Brixmor's same property net operating income ("NOI"), which the Company itself stated was "<u>helpful to investors</u> as a measure of our operating performance," and supposedly "provide[d] a more consistent metric for comparing the performance of our properties."[1]   Defendants' machinations falsely portrayed Brixmor's quarterly same property NOI growth as consistent and stable, which Defendants claimed differentiated Brixmor from its peers.   Indeed, virtually every time Brixmor reported its financial results, Defendants crowed about the number of consecutive quarters in which the Company had achieved same property NOI growth of at least 3.5%.   In reality, the opposite was true: Brixmor's quarterly same property NOI growth fluctuated wildly, frequently declined from one quarter to the next, and <u>often fell below 3.5%</u>.   At the end of the Class Period, Brixmor was forced to disclose that it had fraudulently manipulated its quarterly same property NOI growth rates <u>for its entire history as a public company</u>, and that its entire senior management team had been fired for directing the accounting manipulations.   As a result of these revelations, Brixmor's stock price plunged by more than 20% in a single trading day.

2.     Brixmor is a real estate investment trust ("REIT") that operates a wholly-owned portfolio of shopping centers across the country.   While traditional companies are primarily valued using earnings per share or book values pursuant to Generally Accepted Accounting Principles ("GAAP"), REITs such as Brixmor are analyzed by examining alternative

---

[1] Unless otherwise noted, all emphasis has been added.

performance metrics that are of specific importance to the real estate industry.  NOI—referred to as "the single most important measurement in commercial real estate"[2]—is the sum of money remaining after operating expenses have been deducted from a property's rental income.  Same property NOI measures NOI on a static number of properties to give insight as to how a portfolio of retail assets, such as Brixmor's, performs over a period of time.  NOI is crucial because, as an evaluation of a portfolio's profitability, it impacts property market values, financing costs and a host of other holding period decisions. For these reasons, a former Brixmor employee characterized NOI as "the driver" and "the gauge of the company."

3.     Throughout the Class Period, Brixmor posted industry-leading same property NOI growth that was remarkably consistent and stable, including ten consecutive quarters above 3.5%, and five consecutive quarters of same property NOI growth ranging between 3.8% and 3.9%.  Each time that Brixmor publicly reported its financial results, the Individual Defendants made clear that this manufactured consistency was the key to the Company's success, and was "unmatched" in the industry.  For instance, Defendant Carroll, Brixmor's CEO, stressed that the Company's consistent quarterly same property NOI growth was part of the Company's "secret sauce" that was "unlike a lot of other people in this space" and "unmatched in the space today." Similarly, during a February 2015 investor call, Carroll boasted of the Company's "10th consecutive quarter of same property NOI growth in excess of 3.5%.  No other sector peer can make this statement."  And Defendant Pappagallo also emphasized that investors should use "the word consistency to describe our financial results," and that the Company's streak of quarterly same property NOI growth "underlies that consistency."

---

[2]     http://incomepropertyanalytics.com/the-most-important-measurement-net-operating-income-noi/.

4.     Reflecting the importance of these misrepresentations, analysts, research firms and ratings agencies regularly cited Brixmor's purportedly consistent and stable quarterly same property NOI growth in recommending its stock.  For example, on August 6, 2014, Wells Fargo specifically noted that "consistency and accuracy are the most important factors for BRX this year given its short time as a public company."  Similarly, a March 16, 2015 *SeekingAlpha.com* article highlighted that one of the "catalysts support[ing] the argument that Brixmor is a stock worth owning" was the fact that "[t]he company has reported 10 consecutive quarters of same property NOI growth in excess of 3.5%."

5.     However, as was ultimately revealed, the Company's representations regarding same property NOI growth were materially false and misleading.  In late December 2015, the Company received information through an internal audit hotline alleging that its most senior officers had committed accounting fraud.  Following the receipt of that information, the Audit Committee launched an investigation, and quickly determined that the allegations were true.  On February 8, 2016, Brixmor stunned investors by announcing that, throughout the Class Period— its entire history as a public company—its senior officers had been "smoothing income items," both up and down, to create the illusion of consistent same property NOI growth across quarters.

6.     In essence, at the end of each quarter, the Company's most senior officers— including its CEO and CFO—would "override" the Company's internal controls and "adjust" quarterly same property NOI growth to make it appear as if it was consistent, stable, and growing, when in fact it was highly volatile and fluctuated wildly from quarter to quarter.  Tellingly, rather than consistently reporting growth of 3.5% or better for ten consecutive quarters, as Defendants repeatedly emphasized, Brixmor actually reported several quarters during the Class Period where same property NOI growth fell well below 3.5%—including only

2.7% in the fourth quarter of 2013, which was the Company's first full quarter as a public company.  Moreover, for a majority of the Class Period—five out of eight quarters—Brixmor's true same property NOI growth rates actually declined when compared to the prior quarter's results.  Thus, through their accounting fraud, the Individual Defendants were able to create the false impression that Brixmor's quarterly same property NOI growth rates were steady and predictable, when in reality they were not.

7.     Significantly, in disclosing the fraud, Brixmor left no doubt that the Individual Defendants were directly responsible for the accounting scheme.  On February 8, 2016, the Company announced that it had terminated Defendant Carroll, its CEO; Defendant Pappagallo, its President and CFO; and Defendant Splain, its Chief Accounting Officer and Treasurer (in corporate-speak, these officers collectively "resigned, effective immediately").  The Company made crystal clear that it did so because these senior officers "were directly involved and/or supervised persons directly involved" in the accounting manipulations, while noting that these falsifications were "contrary to GAAP" and effectuated "to achieve consistent quarterly same property net operating income growth."  Furthermore, in language that was remarkable in both its tone and candor, Brixmor publicly excoriated the Individual Defendants, emphasizing that the misconduct "occurred at senior levels of management"; "that the conduct and judgment exercised by senior management was unacceptable"; and that the Individual Defendants' actions "failed to demonstrate commitment to integrity and ethical values."

8.     Former Brixmor employees further confirmed that the accounting machinations necessarily implicated the Individual Defendants' involvement, as opposed to junior accounting employees.  These former employees noted that "nobody was really looking at the entire picture

other than upper management," and because of this centralization of access and knowledge, the fraud was transacted at the highest levels and "was definitely top down."

9.     Sophisticated market participants understood full well that the Individual Defendants were complicit in the Brixmor fraud.  For example, a SunTrust report noted that consistent same property NOI growth was central to the Company's investment "story," and that "volatile" same property NOI results "could have been damaging to that thesis or image." Moody's stated that the "accounting irregularity engenders questions about the company's credibility and maintenance of investor trust"; a *SeekingAlpha.com* article advised investors to avoid Brixmor securities in the wake of "accounting shenanigans"; and a Sandler O'Neill & Partners LP analyst stated that the executive departures were "a complete shock," and that the Individual Defendants "risk[ed] everything to fudge" the Company's financial metrics.  In the aftermath, a host of research firms downgraded their ratings on Brixmor securities.

10.     In response to the Company's stunning admissions, Brixmor's stock price plummeted by over 20%, closing down $5.32 from $26.42 per share on Friday, February 5, 2016 to $21.10 per share on Monday, February 8, 2016, wiping out nearly $1.6 billion in market capitalization in one trading day, on unusually heavy trading volume of 21 million shares.

11.     The fallout from Defendants' fraud continues to this day.  In light of Defendants' material misrepresentations made during the Class Period, the SEC and the United States Attorney's Office for the Southern District of New York launched investigations into the Brixmor accounting scandal.  Both of these investigations remain ongoing.

12.     Meanwhile, investors who purchased Brixmor securities at artificially-inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws.  This lawsuit seeks redress on behalf of these aggrieved shareholders.

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    THE PARTIES

### A.    Lead Plaintiffs

16.    Plaintiff City of Birmingham Retirement and Relief System ("Birmingham") is a public pension system organized for the benefit of current and retired public employees of the city of Birmingham, Alabama.  Birmingham has approximately 4,000 active participants, and approximately 3,400 retirees.  As of January 8, 2016, Birmingham had pension assets under management of over $1 billion.  As set forth in its certification submitted concurrently herewith, Birmingham purchased Brixmor common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On November 29, 2016,

the Court appointed Birmingham as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  *See* ECF No. 58.

17.     Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Local 60") is a public pension system based in Hawthorne, New York that was established through collective bargaining between the Laborers International Union of North America, Local 60, the Construction Industry Council and various employers.   Plans encompassed under Local 60's benefit system include a Health Benefits Plan, Annuity Plan, Pension Plan, and Legal Services Fund for its members.  As of December 31, 2015, Local 60 oversaw more than $154 million in assets.  As set forth in its certification submitted concurrently herewith, Local 60 purchased Brixmor common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On November 29, 2016, the Court appointed Local 60 as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  *See* ECF No. 58.

18.     Plaintiff Teamsters Local 456 Annuity Fund ("Local 456") is a defined contribution plan with a profit-sharing component.  Local 456 currently has approximately 1,900 active participants, and over $175 million in plan assets.  As set forth in its certification submitted concurrently herewith, Local 456 purchased Brixmor common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On November 29, 2016, the Court appointed Local 456 as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  *See* ECF No. 58.

B.    **Defendants**

1.    **Brixmor**

19.    Defendant Brixmor is a Maryland corporation, with its principal executive offices located at 450 Lexington Avenue, New York, New York 10017.  Brixmor is structured as a REIT, which is a company that owns and operates income-producing real estate or real estate-related assets.  Throughout the Class Period, Brixmor common stock traded on the New York Stock Exchange, where its stock was publicly traded under the symbol "BRX."  As of April 8, 2016, there were 299,257,744 shares of Brixmor common stock outstanding.

20.    Brixmor owns 100% of the common stock of BPG Subsidiary Inc. ("BPG Sub"), which, in turn, is the sole owner of Brixmor OP GP LLC, or the sole general partner of the Operating Partnership.  The "Operating Partnership" means the Brixmor Operating Partnership LP and its consolidated subsidiaries.  As stated in Brixmor's filings with the SEC, Brixmor management operates Brixmor and the Operating Partnership as one business.  The management of Brixmor consists of the same individuals as the management of the Operating Partnership.  These individuals are officers of both Brixmor and the Operating Partnership.  Brixmor and the Operating Partnership operate as a consolidated company.  As a REIT, Brixmor's only material asset is its indirect interest in the Operating Partnership, and does not conduct business itself other than issuing public equity from time to time.  The Operating Partnership holds substantially all of the assets.  Except for net proceeds from public equity issuances by Brixmor, which are contributed to the Operating Partnership in exchange for outstanding partnership common units of interest, the Operating Partnership generates all remaining capital required by the Company's business.

## 2.    The Individual Defendants

21.    Defendant Michael Carroll ("Carroll") was, at all relevant times, CEO of Brixmor.  Carroll served as the Company's CEO from February 2009 until his resignation. Carroll also served as a director from 2013 until his resignation.  Previously, Carroll served as Executive Vice President and Chief Operating Officer of Brixmor from April 2007 through February 2009.  On February 8, 2016, the Company announced that Carroll had resigned from his executive positions effective immediately.

22.    During the Class Period, Defendant Carroll made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations, including on May 8, 2014, August 6, 2014, October 28, 2014, February 10, 2015, April 28, 2015, June 10, 2015, July 28, 2015, and September 17, 2015.  Defendant Carroll also reviewed, approved, signed and certified Brixmor's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on March 12, 2014, May 7, 2014, August 5, 2014, November 4, 2014, February 19, 2015, April 27, 2015, July 27, 2015, and October 26, 2015, which contained materially false and misleading statements and omissions.  Carroll made further materially false and misleading statements and omissions in the Company's press releases published on February 19, 2014, May 7, 2014, August 5, 2014, July 27, 2015, and October 26, 2015.  Defendant Carroll also made materially false and misleading statements and omissions in an interview with Howard Kline of CRE Radio & TV at ICSC's RECon: The Global Retail Real Estate Convention, during a presentation at the February 2015 Devonshire REIT Symposium, in Brixmor's 2013 Annual Report, and in Brixmor's 2014 Annual Report.

23.    Defendant Michael Pappagallo ("Pappagallo") was, at all relevant times, President and CFO of Brixmor.  Pappagallo served as the Company's President and CFO from

May 2013 until his resignation.  From April 2010 to May 2013, Pappagallo was Chief Operating Officer of Kimco Realty Corporation.  On February 8, 2016, Brixmor announced that Pappagallo had resigned from his executive positions effective immediately.

24.     During the Class Period, Defendant Pappagallo made materially false and misleading statements and omissions during earnings calls and investor conferences and presentations, including on February 20, 2014, August 6, 2014, September 8, 2014, March 4, 2015, September 17, 2015, October 27, 2015.  Defendant Pappagallo also reviewed, approved, signed and certified Brixmor's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on March 12, 2014, May 7, 2014, August 5, 2014, November 4, 2014, February 19, 2015, April 27, 2015, July 27, 2015, and October 26, 2015, which contained materially false and misleading statements and omissions.

25.     Defendant Steven Splain ("Splain") was, at all relevant times, Chief Accounting Officer and Treasurer of Brixmor.  Splain served as the Company's Chief Accounting Officer from April 2007 until his resignation and as an Executive Vice President from July 2008 until his resignation.  On February 8, 2016, the Company announced that Splain had resigned from his executive positions effective immediately.

26.     During the Class Period, Defendant Splain reviewed, approved, and signed Brixmor's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on March 12, 2014, May 7, 2014, August 5, 2014, November 4, 2014, February 19, 2015, April 27, 2015, July 27, 2015, and October 26, 2015, which contained materially false and misleading statements and omissions.

27.     Defendants Carroll, Pappagallo and Splain are collectively referred to herein as the "Individual Defendants."

10

## IV.   OVERVIEW OF THE BRIXMOR FRAUD

### A.   Background of Brixmor

#### 1.   Brixmor's Real Estate Business

28.     Brixmor owns and operates a portfolio of grocery-anchored community and neighborhood shopping centers, with approximately 521 properties, aggregating approximately 87 million square feet of gross leasable area, located primarily within the top 50 U.S. metro markets.  The Company divides its total portfolio into three regions: South, North and West, with approximately an equal number of properties in each region.   The Company's four largest tenants are The Kroger Co., The TJX Companies, Inc., Publix Super Markets, Inc., and Wal-Mart Stores, Inc.

29.     By organizing itself as a REIT, Brixmor receives favorable tax treatment.  Under this structure, REITs are generally not required to pay federal income taxes on earnings from operations and other REIT-qualifying activities contingent upon meeting applicable distribution, income, asset, shareholder, and other tests.   To maintain its REIT status, the U.S. Internal Revenue Code requires that Brixmor follow certain specified rules.  As stated in Brixmor's 2014 Form 10-K, at least 75% of the value of Brixmor's assets must consist of cash, cash items, government securities and qualified REIT real estate assets.   In addition, the Company is required to distribute 90% of its REIT taxable income to investors, with any amount not distributed by the REIT taxed at corporate rates.

30.     One of the byproducts of Brixmor's REIT structure is that investors pay close attention to alternative operating performance metrics, and even slight changes in these metrics can have a material impact on the Company's stock price.  The Individual Defendants were well-

aware of this dynamic.  For example, in a July 2015 interview with CFO Magazine, Defendant

Pappagallo articulated this fact:

> The REIT industry is covered extensively by the investment research community.
> One could argue that the number of sell-side research shops covering REITS is
> well out of proportion to the industry's market capitalization. <u>There is an ongoing
> demand for detailed, granular guidance on earnings expectations and operating
> performance statistics, and notice is taken of even slight differences. So careful
> communication of expectations, and changes in them, is required.</u>[3]

### 2. The Importance of Consistent Quarterly Same Property NOI Growth in Evaluating Brixmor's Operations

31.     Valuations of traditional companies focus on customary metrics presented

pursuant to GAAP.  However, in valuing a REIT, traditional metrics like the earnings-per-share

ratio, growth, and the price-to-earnings multiple do not apply.  In valuing REITs, the investing

public instead uses alternative metrics that attempt to measure the profitability of a real estate

property or portfolio of properties.

32.     NOI is generally considered "the single most important measurement in

commercial real estate"[4] and "one of the important pieces for building a net asset value

calculation for a property or a portfolio of properties such as a REIT."[5]  NOI "is an important

gauge of financial strength" and "the primary determinant of a property's market value."[6]  NOI is

a measure of a rental property's net income from all sources before allocations for debt service or

taxes (payments or savings) are calculated.  In other words, it is the sum of money remaining

after the operating expenses have been deducted from all the property's rental income.  NOI is

---

[3] http://ww2.cfo.com/capital-markets/2015/07/how-a-reits-finance-chief-keeps-things-simple-brixmor/.

[4] http://incomepropertyanalytics.com/the-most-important-measurement-net-operating-income-noi/.

[5] http://www.fool.com/investing/general/2006/06/12/the-scoop-on-the-noi-number.aspx.

[6] Prassas, Fred W., CPM, *Investment Real Estate: Finance & Asset Management*, Institute of Real Estate Management, at 75.

calculated by taking property level revenue, and then subtracting property-level expenses (real estate taxes, operating expenses, and marketing expenses).[7]

33.     Most REITs, including Brixmor, provide a "same-store" or "same property" NOI figure.  Brixmor stated that same property NOI is "a non-GAAP measure often used by real estate companies as a supplemental measure of operating performance."  Same property NOI is used to reflect the performance of stores that have been open for 13 months or more compared with the prior 13-month period.  In the REIT world, the idea is similar: same property NOI measures NOI on a static number of properties to give insight as to how a portfolio of assets performs over a period of time, thereby demonstrating the REIT's ability to generate consistent growth from existing properties, as opposed to property acquisitions.[8]  Because of this useful comparison to prior periods, quarterly same property NOI growth is a crucial metric to which investors pay close attention.

34.     In fact, Brixmor explicitly acknowledged the utility of same property NOI for investors:

> "We believe that same property NOI is helpful to investors as a measure of our operational performance because it includes only the net operating income of properties owned for the full period presented, which eliminates disparities in net

---

[7] Brixmor defined NOI as "a non-GAAP measure often used by real estate companies. We calculate NOI as total property revenues (minimum rent, percentage rents, and recoveries from tenants and other income) less direct property operating expenses (operating and maintenance and real estate taxes) from the properties owned by us. NOI excludes corporate level income (including management, transaction, and other fees)."  IPO Prospectus at iii.

[8] Brixmor defined same property NOI as "total property revenues (minimum rent, percentage rents, and recoveries from tenants and other income) less direct property operating expenses (operating and maintenance and real estate taxes) from the properties owned by us. NOI excludes corporate level income (including transaction and other fees), lease termination income, straight-line rent and amortization of above-/below-market leases of the same property pool from the prior year reporting period to the current year reporting period. Same property NOI includes all properties in the IPO Portfolio that were owned as of the end of both the current and prior year reporting periods and for the entirety of both periods, excluding properties classified as discontinued operations."  *Id*.

income due to the acquisition or disposition of properties during the period presented, and, therefore, <u>provides a more consistent metric</u> for comparing the performance of our properties."[9]

35.      Furthermore, Defendants emphasized that same property NOI was an extremely useful measure of its financial performance that was "frequently used" by sophisticated market participants:

> Same property NOI is a supplemental, non-GAAP financial measure utilized to evaluate the operating performance of real estate companies and <u>is frequently used by securities analysts, investors and other interested parties in understanding business and operating results regarding the underlying economics of our business operations</u>. It includes only the net operating income of properties owned for the full period presented, which eliminates disparities in net income due to the acquisition or disposition of properties during the period presented, and therefore provides a <u>more consistent metric for comparing the performance of properties</u>. Management uses Same Property NOI to review operating results for comparative purposes with respect to previous periods or forecasts, and also to evaluate future prospects.[10]

36.      NOI, and in particular same property NOI, is thus a critical valuation tool because, as an assessment of a property or portfolio's profitability before financing and overhead costs, it impacts property market values, financing costs and a host of other holding period decisions.  Lenders are particularly conscious of this metric because they want to ensure that mortgage obligations can be met.

37.      Former Brixmor employees[11] corroborated the Company-wide knowledge of same property NOI's importance to its valuation.  For example, FE 1,[12] a former Director of

---

[9] IPO Prospectus at 22, 99.

[10] 2013 Form 10-K at 67-68.  This statement was repeated in substantially similar form in the Company's filings throughout the Class Period, including in the following: 1Q 2014 Form 10-Q at 32; 2Q 2014 Form 10-Q at 36; 3Q 2014 Form 10-Q at 30; 2014 Form 10-K at 48; 1Q 2015 Form 10-Q at 33; 2Q 2015 Form 10-Q at 37; and 3Q 2015 Form 10-Q at 38.

[11] Former Brixmor employees are referred to herein as "FE __" and are referenced in the feminine form to maintain their confidentiality.

Portfolio Management for Brixmor, stated that as a publicly-traded REIT, "<u>NOI is the driver, the</u> <u>operating metric to see how a (REIT) is performing.</u>"  FE 1 stated that "<u>NOI is the gauge of the</u> <u>company,</u>" and that "everything below NOI is not necessarily related to the day-to-day activities of the company, which is managing real estate.  Below NOI is stuff related to administrative expenses and capital and accounting functions, straight-line rents.  But really when you are talking about 'Are we leasing space?' 'Are we getting stronger rents?' 'Are we finding opportunities for ancillary income, other income, what are our expenses at the properties?'…<u>that</u> <u>stuff boils down to NOI.</u>"

38.     Against this backdrop, the Individual Defendants heavily promoted Brixmor's consistent quarterly same property NOI growth to investors throughout the Class Period.

### B.     <u>The Individual Defendants Repeatedly Touted Brixmor's Consistent</u> <u>Quarterly Same Property NOI Growth Throughout The Class Period</u>

39.     Brixmor went public in October 2013 in the largest retail REIT IPO since 1993. In advance of the IPO, the Individual Defendants assured investors that Brixmor common stock was a sound investment precisely because of its steady quarterly same property NOI growth. Brixmor's mantra during the IPO and throughout the Class Period was unwavering: the

---

[12] From November 2010 through September 2016, FE 1 worked in various position of Portfolio Management for Brixmor, most recently as Director of Portfolio Management.  FE 1's responsibilities in this regard included portfolio level review and reporting, asset level business plan execution, and forecasting; recommendations concerning portfolio and asset-level performance; evaluation of monthly, quarterly and year-to-date performance supporting investor expectations and comparison to industry peers; creating forecasts and re-forecasts to timely report asset performance; financial analytical and presentation support to implement strategies to enhance growth in the portfolio through leasing, repositioning and capital deployment; serving as a liaison between the Executive Management Team and operations, including property management, accounting, leasing and construction; and managing an additional non-owned asset portfolio through disposition, including budgeting, financial reporting, qualitative review and leasing.

Company's portfolio provided same property NOI growth that was consistent, stable and second to none.

40.     For example, on December 4, 2013, during Brixmor's first earnings conference call as a publicly-traded company, Defendant Carroll proclaimed: "Our investment thesis is simple, we are a team of operators and we'll build lasting shareholder value through consistent NOI growth."  The following quarter, during an investor conference call, Carroll reiterated that "we're in this business for growing NOI."

41.     Having convinced investors that same property NOI growth was a "more consistent metric" for evaluating the Company's operating performance, Defendants proceeded to manipulate that metric to make it appear far more consistent than it in fact was.  Throughout the Class Period, Brixmor publicly reported consistent and steady quarterly same property NOI growth that outpaced its competitors, evidenced the Company's stable operating performance, and differentiated the Company from its peers.  Indeed, for the vast majority of the Class Period—seven out of eight quarters—Brixmor reported same property NOI growth of 3.5% or better.[13]  Moreover, for five consecutive quarters, beginning with the fourth quarter of 2013 and continuing through the fourth quarter of 2014, Brixmor reported remarkably stable same property NOI growth of either 3.8% or 3.9%.  Significantly, when Defendants reported the Company's financial results, they emphasized both the "consistency" of Brixmor's operating performance, and boasted about the number of consecutive quarters where the Company had achieved same property NOI growth of at least 3.5%.

---

[13] It was not until the first quarter of 2015, or 14 months into the Class Period, that Brixmor reported same property NOI growth below 3.5%—and even then, the Company reported 3.4% NOI growth.

42.     Thus, for example, at the March 3, 2014 Citi Global Property CEO Conference in Hollywood, Florida, Defendant Carroll stated that Brixmor's consistent same property NOI growth was part of the Company's "secret sauce" that was "unlike a lot of other people in this space."  Similarly, when Brixmor reported its financial results for the second quarter of 2014 on August 6, 2014, Defendant Carroll boasted that "[w]e have now achieved same property NOI growth in excess of 3.5% for the eighth consecutive quarter."   When the Company again reported strong same property NOI growth two quarters later, Defendant Carroll crowed: "This marks the 10th consecutive quarter of same property NOI growth in excess of 3.5%.  No other sector peer can make this statement."  The following quarter, at a June 10, 2015 investor forum, Carroll again emphasized the value of this consistency: "We've had 11 quarters of 3.4% or better same-property NOI and those are things that are generally unmatched in the space today."

43.     At a September 17, 2015 conference, Defendant Pappagallo stated that same property NOI growth "is certainly a metric which is looked at very, very carefully by REIT investors," and he highlighted Brixmor's "[v]ery consistent same-property NOI growth." Likewise, during an October 27, 2015 investor conference call, Pappagallo noted: "Last quarter, I began my prepared remarks using the word consistency to describe our financial results and I'm pleased to be able to use that word again.  Our same property NOI growth remains strong, resilient and consistent."

44.     Analysts themselves relied heavily on the purported consistency and stability of Brixmor's same property NOI when evaluating the Company.  For example, on August 5, 2014, KeyBanc issued a report stating that since the IPO, "management has executed well and is on its way to establishing a solid track record of producing predictable results."  Similarly, the following day, Wells Fargo issued a report in which it emphasized that "consistency and

accuracy are the most important factors for BRX this year given its short time as a public company."  As the Class Period continued, and Brixmor continued to report strong and consistent NOI growth, analysts emphasized that the principal reason to buy Brixmor was precisely because of its stable same property NOI results.  Thus, for example, on March 16, 2015, *SeekingAlpha.com* stated that one of the "catalysts support[ing] the argument that Brixmor is a stock worth owning" was its "sector leading NOI growth," and the fact that the Company had "reported ten consecutive quarters of same property NOI growth in excess of 3.5%."

45.     Accordingly, throughout the Class Period, the Individual Defendants went out of their way to promote the consistency of Brixmor's publicly-reported quarterly same property NOI figures, and made clear that it was this consistency and stability that set the Company apart from its peers.   As depicted in the charts presented below, the Individual Defendants' machinations created the illusion of consistent same property income growth across quarters, when in reality, same property growth fluctuated wildly from quarter to quarter, and often fell below the 3.5% threshold which Defendants repeatedly highlighted to investors:



## C.   The Individual Defendants Falsified Brixmor's Same Property NOI Growth

### 1.   An Audit Committee Investigation Exposes The Individual Defendants' Fraud

46.     Fueled by Defendants' materially false and misleading statements regarding quarterly same property NOI growth, the price of Brixmor common stock rose concomitantly during the Class Period, reaching a high of $27.39 per share in January 2015—an increase of almost 40% compared to its IPO price.  As late as February 5, 2016—the day before Brixmor's public disclosures of the fraud—Brixmor stock traded at prices close to its Class Period high, closing at $26.42 per share.  The next trading day, the Company was forced to come clean.

47.     On February 8, 2016, Brixmor issued a Form 8-K in which it disclosed that, in late December 2015, the Company had received information through its audit alert line asserting that Defendants had been misreporting same property NOI for years.  In response to the tip, the Audit Committee commenced an investigation into Brixmor's accounting. That investigation quickly uncovered the Individual Defendants' misconduct, and culminated just over a month later with the Company's admission that the Individual Defendants had intentionally and deliberately manipulated Brixmor's quarterly same property NOI growth rates for its entire history as a publicly-traded company.

48.     Specifically, the Company was forced to acknowledge that, throughout the Class Period, Defendants had been "smoothing income items, both up and down," to create the illusion that Brixmor was reporting consistent same property income growth across quarters.  The Company made clear that these accounting machinations were not due to innocent mistakes or complex accounting judgments; nor were they attributable to low level, "rogue" employees.  To the contrary, it was Brixmor's most senior officers who perpetrated the fraud, manipulating and adjusting same property NOI at the end of each quarter to make it appear as if NOI growth was stable and secure.  In so doing, the Individual Defendants intentionally overrode the Company's own system of internal controls—the very safeguards Brixmor had put in place to protect its financial statements from fraud.

49.     As a result, as Brixmor announced on February 8, 2016, Defendants Carroll, Pappagallo and Splain, as well as Michael Mortimer, the Company's Senior Vice President of Management Accounting, were immediately terminated from the Company.  Tellingly, these four senior officers were the only employees fired or forced to resign as a result of the Audit Committee investigation.  And the Company's Form 8-K left no doubt as to why: these senior

officers were the ones who "were directly involved and/or supervised persons directly involved in smoothing income items between reporting periods in a manner contrary to GAAP in an effort to achieve consistent quarterly same property net operating income growth."

50.     The Company further revealed that the actions of its most senior officers were indefensible and inexcusable.  Notably, Brixmor admitted that, to make the NOI adjustments, the Company's internal controls had to be overridden, and "the override of controls . . . occurred at senior levels of management."  Moreover, during the call on February 8, 2016 to discuss the Audit Committee's investigation, Michael Berman, the Chairman of Brixmor's Audit Committee, stated that the Board's decision to terminate the Individual Defendants was "directly related to [the officers'] course of conduct," and he pointedly noted that the Board had "determined that the conduct and judgment exercised by senior management was unacceptable."  Similarly, in Brixmor's 2015 Form 10-K, the Company acknowledged that the Individual Defendants acted unethically and without integrity, stating that their "actions failed to demonstrate commitment to integrity and ethical values."

51.     As a result of the fraud, the Company was forced to adjust its previously-reported quarterly same property NOI growth figures for the entire Class Period.  The revised figures revealed that, in stark contrast to the Individual Defendants' false portrayal of the Company's same property NOI growth as being consistent, reliable and steady, this measure was actually highly volatile, declining from one quarter to the next for a majority of the Class Period (five out of eight quarters), and frequently falling below the 3.5% threshold that Defendants emphasized:

### Same Property NOI Growth — Reported vs. Actual

|                | 4Q13  | 1Q14  | 2Q14 | 3Q14  | 4Q14   | 1Q15 | 2Q15   | 3Q15 |
|----------------|-------|-------|------|-------|--------|------|--------|------|
| Reported       | 3.9%  | 3.8%  | 3.8% | 3.9%  | 3.9%   | 3.4% | 3.6%   | 3.6% |
| Actual         | 2.7%  | 3.9%  | 3.6% | 3.1%  | 5.1%   | 3.4% | 4.1%   | 3.3% |
| % Overstatement | 44.4% | -2.6% | 5.6% | 25.8% | -23.5% | 0.0% | -12.2% | 9.1% |

52.     The Individual Defendants' misconduct also exposed Brixmor's deficient internal controls.  Specifically, in the Company's Form 10-K filed with the SEC on February 29, 2016 (the "2015 Form 10-K"), Brixmor admitted that it "identified a material weakness in our internal control over financial reporting and our management has concluded that our disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2015."[14]

### 2.     Former Brixmor Employees Corroborate The Individual Defendants' Role In The Brixmor Accounting Fraud

53.     Former employees of Brixmor corroborated that, because of the segmentation in accounting responsibility over the Company's portfolio, only the Individual Defendants had the requisite visibility and access to manipulate quarterly same property NOI on a macro level.  For example, FE 2,[15] a former Brixmor Corporate Accountant, recounted that the Company's portfolio was divided by region rather than by lender, with three regions covering South, North and West.  Within each region, approximately ten accountants were assigned responsibility over a small subset portfolio of properties.  FE 2 stated that "on the corporate side, people really only had eyes on one portfolio, so nobody was really looking at the entire picture other than upper management."

---

[14] In addition, Brixmor announced various remediation plans and activities, including (i) the removal of the Individual Defendants; (ii) increased training in ethics, legal compliance and compliance with the Company's Code of Conduct and related policies; and (iii) organizational structure evaluations, including enhanced control and compliance responsibilities.

[15] FE 2 worked as a Corporate Accountant for Brixmor from February 2013 through December 2014.  FE 2 worked directly on accounting data consolidation and debt compliance reporting.  In this role, FE 2 produced and compiled monthly, quarterly and annual financial statements, as well as quarterly debt compliance reports, to Brixmor's lenders.

54.     FE 3, a former Brixmor Senior Property Manager who was employed at the Company from 2000 through July 2014,[16] corroborated that Brixmor's organizational structure would necessarily implicate only the senior-most executives in the "smoothing" scheme because individual property managers only had visibility with regard to their own portfolio subset of properties.  FE 3 reported that monthly variance reports—or variance analyses—were forwarded by all property managers in the region to the region's Vice President of Property Management, who consolidated the information and reported it to the corporate office.  Indeed, given the trifurcated structure of the Company's portfolio oversight, FE 3 understood that the smoothing scheme was transacted at the highest levels.

55.     Another Brixmor employee also noted the segmentation of the Company's organization, and recalled issues from time to time regarding the accounting treatment of her portion of the portfolio.  Specifically, FE 4,[17] a former Brixmor Property Accountant, relayed that the Company's property accountants each had oversight of a portfolio segment based on region, and were generally responsible for, among other things, preparing NOI work sheets for assigned units.  With regard to management's portrayal of "consistent" NOI growth quarter to quarter during the Class Period, FE 4 stated: "I questioned it to some detail" with regard to her

---

[16] FE 3 worked in various roles for Brixmor from September 2000 through July 2014, most recently as Senior Property Manager.  FE 3 managed 22 separate properties in her portion of the Company's portfolio and was responsible for, among other responsibilities, devising and administering budgets for properties, including reconciling budget variances and preparing monthly reports.

[17] FE 4 worked as a Property Accountant for Brixmor from September 2012 through May 2015.  FE 4's responsibilities included month-ending closing activities; conducting variance analyses, preparing NOI work sheets for assigned units; calculating and adjusting expense recovery ratios for occupancy changes; preparing annual budgets; compiling financial information for monthly management reports encompassing month-to-month and YTD budget to actual changes in tenant occupancy, rent, real estate tax/common area expense recovery, and NOI (Net Operating Income); preparing periodical CAM (Common Area Maintenance) and RET (Real Estate Tax) expense reconciliations, and subsequent tenant billing for assigned properties.

segment of the portfolio, adding that she brought the issue up to both of her supervisors and her colleagues.  FE 4 identified that "they didn't realize gains and losses they incurred.  So, if you have a gain or a loss for the year, then you should show it on your income statement.  What they were doing was letting them sit on the balance sheet for 'x' amount of time and realizing it whenever they wanted to."

56.    When FE 4 objected to both of her supervisors at different points of time that this was improper accounting, they responded "along the lines of, 'This is what senior management wants to do.'"  It was FE 4's understanding that her bosses were referring to mandates by Brixmor's top officers.  Regarding when FE 4 first observed the accounting treatment at issue, FE 4 stated: "I'm pretty sure they were carrying gains and losses on the balance sheet for a while."  FE 4 believed these practices were in play before Brixmor went public in October 2013 "to make our IPO better."

57.    Given Brixmor's pyramid-like organizational structure, even if a junior executive such as FE 4 noted accounting irregularities, such irregularities were specific to a small portion of the portfolio, with no visibility of the macro-level portfolio, so the Individual Defendants' NOI manipulations would have gone undetected.  This is exactly what happened at Brixmor.  FE 2 noted that, from an accounting standpoint, the Company was spreading quarterly same property NOI over the various portfolio segments, "so nobody would necessarily, without the macro view, really be seeing how that was happening."  FE 2 added that, from a corporate accountant perspective, "when you're working with information that's being filtered through a number of other people, it's really hard to see that someone was manipulating the numbers. . . On the corporate [accountant] side, no flags were really being raised because we were seeing this information that, I guess, whatever they were doing, had already been done."  For these reasons,

FE 2 stated that the manipulations could only have been executed at the Senior Vice President of Management Accounting level and up, which only included Michael Mortimer and the Individual Defendants, who "would have been the final decision maker as far as anything related to income smoothing."

58.     The Brixmor accounting fraud hierarchy was further corroborated by FE 5, a former Brixmor Director of Portfolio Management who worked at the Company from 2008 through June 2015.[18]  FE 5 also stated that property accountants would only know their specific territories and the quarterly NOI volatility swings in their specific grouping of properties, but that they would not have a macro view of consolidated same property NOI numbers.  Because of this structure, FE 5 believed that the smoothing scheme "was definitely top down."

59.     In sum, these former employees provide further corroboration that it was only the most senior officers of Brixmor who had the visibility, access and opportunity to manipulate the Company's publicly-reported quarterly same property NOI growth rates.

**D.      The Brixmor Fraud Caused Massive Losses To Investors**

**1.      Investor and Analyst Reaction To The Brixmor Fraud**

60.     After Brixmor disclosed the accounting smoothing scheme, the reaction of the investing community was swift and punishing.  Upon disclosure of Defendants' manipulations, Brixmor's stock price plummeted over 20%, closing down $5.32 from $26.42 per share on February 5, 2016, to $21.10 per share on Monday, February 8, 2016, on unusually heavy trading volume of 21 million shares.  The price drop wiped out nearly $1.6 billion in the Company's market capitalization in a single trading day.

---

[18]  FE 5 worked as a Director of Portfolio Management for Brixmor from September 2008 through June 2015.   FE 5's responsibilities included comprehensive underwriting and due diligence for over 350 retail assets; overseeing financing activities for both mortgage loans and corporate credit facilities; and management of 25 properties and review of portfolio NOI.

61.     In addition, sophisticated market participants understood full well that the Individual Defendants directed the accounting fraud.  Indeed, analysts were stunned by the Company's admissions, and questioned the role and credibility of the Individual Defendants while slashing Brixmor's ratings.

62.     For instance, immediately after Brixmor's February 8, 2016 disclosures, analysts at Wells Fargo downgraded the Company's rating from Outperform to Market Perform, and issued an analyst report explaining that the Individual Defendants' conduct "is inexcusable." SunTrust downgraded Brixmor from Buy to Neutral amid the "veil of uncertainty regarding the company's future, loss of credibility, and ability to raise capital."  SunTrust specifically emphasized that consistent quarterly same property NOI growth was integral to the Brixmor "story," and that volatility in this metric "could have been damaging to that thesis or image":

> Over the past 2 years, we brought up questions regarding SSNOI a few times in our reports or questions to management in 1x1 meetings.  Particularly, on why/how SSNOI looked smooth while the components of SSNOI were volatile.
>
> * * *
>
> One of the elements of BRX's story was that it was a portfolio that was under-leased and had significant growth opportunity over the next several years via releasing of the portfolio, which in theory should result above-average SSNOI for the foreseeable future.  Volatile SSNOI results or weak SSNOI in certain quarters could have been damaging to that thesis or image.

63.     During the February 8, 2016 executive update call with new Brixmor management, a Sandler O'Neill & Partners LP analyst noted that the executive departures were "a complete shock," and that these executives "risk[ed] everything to fudge" the Company's same property quarterly NOI numbers.  In turn, Sandler O'Neill & Partners downgraded Brixmor's shares to hold from buy.

64.     In a February 8, 2016 report, UBS lowered its price target on Brixmor.  RBC, in its report from the same day, lowered its rating on the Company to Underperform "following

disclosure of <u>accounting irregularities</u>," while stressing "the significant uncertainty that now exists at the company."   Stifel Nicolaus & Co. downgraded the Company from Buy to Hold because "until BRX's accounting issues are behind it and a new permanent CEO and CFO are named, we cannot recommend buying the shares."   Further, Deutsche Bank downgraded Brixmor stock from Buy to Hold and noted that "accounting/misconduct questions remain."

65.     Additionally, on February 8, 2016, Moody's shifted its outlook for Brixmor's credit to negative, stating that the revision was in response to Brixmor's recent announcement. "<u>This accounting irregularity engenders questions about the company's credibility and maintenance of investor trust</u>," Moody's said in its report.   Additionally, S&P threatened to cut Brixmor's rating to junk, noting that the improper reporting of non-GAAP same-property net operating income in some periods may affect Brixmor's cost of capital or operating performance due to the turnover of its management team.

66.     Brixmor experienced wide-ranging analyst downgrades in the wake of the accounting scandal, as demonstrated in the following chart:

| Firm | Action | Rating |
|---|---|---|
| Boenning & Scattergood | Downgrades | Outperform -> Neutral |
| Deutsche Bank | Downgrades | Buy -> Hold |
| JPMorgan Chase & Co. | Downgrades | Overweight -> Underweight |
| RBC Capital | Downgrades | Outperform -> Underperform |
| Sandler O'Neill | Downgrades | Buy -> Hold |
| Stifel Nicolaus | Downgrades | Buy -> Hold |
| SunTrust Robinson Humphrey | Downgrades | Buy -> Neutral |
| Wells Fargo Securities | Downgrades | Outperform -> Market Perform |
| KeyBanc Capital Markets Inc. | Downgrades | Overweight -> Sector Weight |
| Barclays | Downgrades | Overweight -> Equal Weight |

67.     In addition to scathing analyst reports and downgrades, the February 8, 2016 disclosures had vast media scrutiny.  As news of the smoothing scheme and the Individual Defendants' resignations broke, CNBC's Jim Cramer stated: "This is today's disaster. They fired the CEO, they fired the CFO, they fired the chief accounting officer, that's a suboptimal situation developing there."[19]

68.     Cramer also stated that day in his *The Street* article and interview "Brixmor Property Tanks on Accounting Issues, Jim Cramer Says Avoid It - Shares of Brixmor Property Group tanked on Monday after three of its top executives resigned following an accounting review" that "accounting irregularities equals sell."[20]

69.     *SeekingAlpha's* February 8, 2016 article entitled "Avoid Brixmor In Wake Of Accounting Shenanigans," stated that Brixmor's quarterly same property NOI smoothing "is troubling and will lead to weakness."[21]  Bloomberg's February 8, 2016 article entitled "Brixmor Plunges as Executives Resign After Review Findings," noted that "shares plunged after Chief Executive Officer Michael Carroll and two other executives resigned following a discovery by the company's audit committee that employees were 'smoothing' income to make quarterly results more consistent" and that it was Brixmor stock's "biggest decline on record."[22]

70.     On February 11, 2016, *MarketWatch* published an article entitled "Executive Bonuses At Issue In Brixmor's Admission of Altered Results."  The article stated that although same property NOI was a non-GAAP measure, "it is one that is paid attention to in the REIT

---

[19] http://video.cnbc.com/gallery/?video=3000492271.

[20] https://www.thestreet.com/video/13451399/brixmor-property-tanks-on-accounting-issues-jim-cramer-says-avoid-it.html.

[21] http://seekingalpha.com/article/3874536-avoid-brixmor-wake-accounting-shenanigans.

[22] https://www.bloomberg.com/news/articles/2016-02-08/brixmor-shares-plunge-as-executives-resign-after-audit-findings.

business."  While the article noted the Company's assertion that quarterly same property NOI was not directly tied to the Individual Defendants' compensation, the article highlighted that this statement was only true "in a narrow sense."  The article pointed out that "[a] measure used to trigger incentive bonuses" tracks similar metrics that the Company uses in calculating same property NOI.  The article further highlighted that "[i]n 2014, Carroll, Pappagallo and Splain were each awarded bonuses <u>for exactly meeting the targeted $2.79 per share on the NOI measure</u>."  The article also quoted an Audit Analytics Vice President, who stated that "[t]his is the first case that I've seen where an accounting issue is supposedly immaterial to GAAP [and] is potentially material to the non-GAAP results."[23]

### 2.   The SEC and the USAO for the SDNY Launch Investigations of Brixmor

71.     The consequences of the Individual Defendants' misconduct continue to this day. In its 2015 Form 10-K, Brixmor revealed that as a result of Defendants' NOI smoothing scheme, "the SEC has commenced an investigation with respect to these matters."  Brixmor added that "[t]he SEC also could impose other sanctions against us or our directors and officers, including injunctions, a cease and desist order, fines and other equitable remedies."  According to the Company's filings with the SEC, as of the date of this complaint, the SEC's investigation into Brixmor remains ongoing.

72.     Additionally, on October 24, 2016, Brixmor reported in its Form 10-Q for the third quarter of 2016 that "the Company was contacted by the United States Attorney's Office for the Southern District of New York which advised that it is investigating these matters as well..."  Reuters reported the investigation, stressing that the investigation by the office of

---

[23] http://www.marketwatch.com/story/executive-bonuses-at-issue-in-brixmors-admission-of-altered-results-2016-02-10?siteid=yhoof2.

Manhattan U.S. Attorney Preet Bharara's office related to the disclosure that "that accounting personnel had manipulated its financial results."[24]  This investigation remains ongoing.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

73.    Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.   Throughout the Class Period, Brixmor's press releases, investor presentations, and public filings made with the SEC included material misstatements and/or omissions concerning the Company's financial results, which included consistently touting consecutive quarters of same property NOI growth above a 3.5% level, and then above a 3.4% threshold throughout the Class Period.

74.    Defendants repeatedly emphasized that Brixmor's consistent and stable quarter same property NOI growth differentiated the Company from its competitors.   Defendants failed to disclose, however, that these financial results were the product of an intentional "smoothing" scheme in which the Individual Defendants manipulated these figures, misleading the public regarding the true volatility of Brixmor's operational results, and in stark contrast to the consistent growth the Company portrayed.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Brixmor's business, operational status, and future growth prospects.

### A.    Fourth Quarter 2013 Financial Results

75.    On February 19, 2014, after the markets closed, Brixmor issued a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2013 ("4Q 2013"), which disclosed an increase in same property NOI growth in the operating

---

[24] http://www.reuters.com/article/us-brixmor-ppty-gp-accounting-idUSKCN12Q223.

highlights section of the announcement: "Same property NOI increased 3.9% for the quarter and 4.0% for the full year 2013 from the same period in 2012."

76.     Defendant Carroll commented on the Company's financial results and growth strategy in the 4Q 2013 earnings release, stressing the importance of achieving "solid same property NOI growth," and stating the following: "Operating metrics during our initial quarter as a public company demonstrated strong positive momentum, indicative of our growth strategy to achieve solid same property NOI growth over the next several years."

77.     On February 20, 2014, the Company held a conference call to discuss its financial results for the 4Q 2013, wherein Defendant Pappagallo reiterated the Company's same property NOI growth:

> Same property net operating income generated a 3.9% increase for the quarter, and 4% for the full year. Notably, only 20 basis points of the quarterly increase can be traced to redevelopment projects, underscoring the growth from core leasing and spreads on renewals and options. Also indicative of the quality of the results is that 85% of the NOI improvement is the consequence of top-line rent growth, with the balance coming from improved expense recovery in tandem with the occupancy increases.

78.     On March 12, 2014, Brixmor filed with the SEC its Form 10-K for the year ended December 31, 2013 ("2013 Form 10-K"). The 2013 Form 10-K was signed by the Individual Defendants and reiterated Brixmor's previously reported financial results for the 4Q 2013.

79.     In connection with the filing of the 2013 Form 10-K, Brixmor released its 2013 Annual Report, which included a letter to shareholders from Defendant Carroll. In his letter, Defendant Carroll highlighted the fact that Brixmor's 4Q 2013 results marked the tenth consecutive quarter of Same Property NOI growth:

**PERFORMANCE IN 2013**

> As a result of our efforts in 2013, we demonstrated sustained positive momentum in key operating metrics. Our same-property NOI increased by 4.0 percent in 2013, marking 10 consecutive quarters of growth on a year-over-year basis,

31

fueled by gains in both occupancy and rent levels. For the year, occupancy climbed 110 basis points to 92.4 percent. During 2013, we executed more than 2,200 new and renewal leases, representing almost 13 million square feet, with lease spreads of approximately 10 percent. Our leasing productivity was the strongest among our public shopping center REIT peers.

80.     Analysts reacted positively to Brixmor's manipulated quarterly same property NOI growth.  For instance, in a February 19, 2014 report, Wells Fargo highlighted Brixmor's "same-store NOI growth of +3.9%," and based on this result, Wells Fargo noted in its "Investment Thesis" that Brixmor was "positioned to sustain higher same-store NOI growth than peers."  Also on February 19, 2014, a report by RBC Capital Markets highlighted the consistency of Brixmor's figures, noting that "[s]ame store NOI growth was sound for the quarter, coming in at 3.9% vs. 3.5% in 3Q13."   A KeyBanc analyst report on this same day emphasized: "Importantly, SSNOI growth was a strong 3.9%."

81.     Defendants' statements identified above in ¶¶75-79 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  Specifically, at the end of the Class Period, Brixmor admitted that its same property NOI growth for the fourth quarter of 2013 was in reality 2.7%, not 3.9%—an overstatement of 44.4%.  Significantly, Brixmor's true same property NOI growth fell dramatically from the 3.5% same property NOI growth reported in the prior quarter.   Thus, Defendants 4Q 2013 results did not demonstrate "sustained positive momentum," and did not mark a tenth consecutive quarter of growth.

82.     In the 2013 Form 10-K, Defendants also represented that same property NOI was a useful non-GAAP financial measure of its financial performance:

> Same property NOI is a supplemental, non-GAAP financial measure utilized to evaluate the operating performance of real estate companies and is frequently used by securities analysts, investors and other interested parties in understanding

business and operating results regarding the underlying economics of our business operations. It includes only the net operating income of properties owned for the full period presented, which eliminates disparities in net income due to the acquisition or disposition of properties during the period presented, and therefore provides a <u>more consistent metric for comparing the performance of properties</u>. Management uses Same Property NOI to review operating results for comparative purposes with respect to previous periods or forecasts, and also to evaluate future prospects.[25]

83.     The statements set forth above that same property NOI provided "a more consistent metric for comparing the performance of properties" was materially false and misleading in light of Defendants' "smoothing" scheme.  Defendants knew that quarterly same property NOI growth did <u>not</u> provide a "more consistent metric" for evaluating Brixmor's operating performance because, in reality, Defendants were manipulating this measure to create the false impression that quarterly same property NOI was stable and consistent when it was not. Moreover, same property NOI did <u>not</u> include only the net operating income of properties owned for the full period presented, as Defendants represented.  To the contrary, Defendants simply created a fictitious number to use for this measure.

### B.     First Quarter 2014 Financial Results

84.     On May 7, 2014, Brixmor issued a press release announcing the Company's financial results for the first quarter ended March 31, 2014 ("1Q 2014"), which noted that Brixmor "<u>Achieves Same Property NOI Growth of 3.8%</u>":

Same Property NOI for the first quarter increased 3.8% from the comparable 2013 period primarily due to growth in rental income driven by a 100 basis point year-over-year increase in billed occupancy and improved leasing spreads.

---

[25] 2013 Form 10-K at 67-68.  This statement was repeated in substantially similar form in the Company's filings throughout the Class Period, including in the following: 1Q 2014 Form 10-Q at 32; 2Q 2014 Form 10-Q at 36; 3Q 2014 Form 10-Q at 30; 2014 Form 10-K at 48; 1Q 2015 Form 10-Q at 33; 2Q 2015 Form 10-Q at 37; and 3Q 2015 Form 10-Q at 38.

85.     In the earnings press release, Defendant Carroll boasted of this continued quarterly NOI growth, stating: "We kicked-off 2014 by delivering another strong quarter of same property NOI growth…"

86.     Also on May 7, 2014, the Company filed its Form 10-Q for the first quarter of 2014 ("1Q 2014 Form 10-Q"), which was signed by the Individual Defendants and reiterated Brixmor's previously reported financial results.

87.     On May 8, 2014, Brixmor held a conference call to discuss its financial results for the first quarter of 2014, wherein Defendant Carroll touted the Company's quarterly same property NOI growth, and claimed that such growth "set the standard for the industry," and provided investors with a "clear tool" to understand the Company's performance:

> Consistent with our guidance and expectations, we reported strong same-property NOI growth of 3.8% during the quarter, driven predominantly by rent growth. The transparency and simplicity of our business is best exemplified by the fact that our same-property NOI translates to cash EBITDA growth of over 4%. Our disclosure continues to set the standard for the industry, and provides investors a clear tool to understand our performance.

88.     Analysts again pounced on the consistency of Brixmor's quarterly same property NOI growth.  For instance, a May 7, 2014 Wells Fargo report noted that "precision is an important driver for BRX given its short time as a public company; as such, BRX shares could outperform peers in trading tomorrow."  Similarly, Moody's issued a report on May 13, 2014 highlighting that Brixmor "is exhibiting consistently stronger operating performance with Brixmor producing 3.8% same property NOI growth for 1Q14 vs. 1Q13."

89.     Defendants' statements identified above in ¶¶84-87 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.

### C.   May 2014 Global Retail Real Estate Convention

90.     On May 18, 2014 through May 20, 2014, the International Council of Shopping Centers ("ICSC") held RECon: The Global Retail Real Estate Convention in Las Vegas, Nevada. During the convention, Defendant Carroll participated in an interview with Howard Kline of CRE Radio & TV, which was published online and entitled "The Importance of Maintaining Focus on Your Real Estate Business Model: Interview with Brixmor CEO, Michael Carroll."[26]

91.     During the interview, Defendant Carroll touted the Company's remarkably stable and consistent quarterly same property NOI growth, stating the following:  "We've been drawing nice income increases . . . 7 of our last 8 quarters we've been between 3 and a half and 4 and a half percent same property NOI [] which has been generally at the top of the peer group and you know that's been mainly our focus going forward."

92.     Defendant Carroll's statement identified above in ¶91 was false and misleading, and omitted material facts when made.  Indeed, in the fourth quarter of 2013, Brixmor's same property NOI growth was much less than 3.5%.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  Defendants purposefully manipulated same property NOI growth in order to maintain a façade of steady and consistent quarterly NOI growth.  Furthermore, as a result of these manipulations, Defendant Carroll's comparisons of Brixmor to its industry peers were false and misleading and without basis when made.

---

[26]http://creradio.com/videos/importance-maintaining-focus-real-estate-business-model-interview-brixmor-ceo-michael-carroll/.

**D.**    **June 2014 SPO**

93.    On or about June 26, 2014, Brixmor completed a secondary offering in which the Company sold over 34 million shares at $22.50 per share, for total proceeds of approximately $775 million (the "June 2014 SPO").

94.    The June 2014 SPO Registration Statement and June 2014 SPO Prospectus[27] reported Brixmor's same property NOI growth for Q1 2014.   Additionally, among other documents, the June 2014 SPO Registration Statement and the June 2014 SPO Prospectus incorporated by reference the Company's 2013 Form 10-K and 1Q 2014 Form 10-Q. Accordingly, the false and misleading statements and omissions included in Brixmor's 2013 Form 10-K and 1Q 2014 Form 10-Q were incorporated by reference therein.   These statements continued to be false and misleading and omitted material facts for the same reasons as described above in ¶¶81, 89.

**E.**    **Second Quarter 2014 Financial Results**

95.    On August 5, 2014, Brixmor issued a press release announcing the Company's financial results for the second quarter ended June 30, 2014 ("2Q 2014"), which highlighted that Brixmor "Achieves Same Property NOI Growth of 3.8%":

> Brixmor delivered another quarter of strong results driven by continued growth in revenues and momentum in operating fundamentals.   Same property NOI increased 3.8% in the second quarter, marking the eighth consecutive quarter of growth over 3.5%.

---

[27] In connection with the June 2014 SPO, Brixmor filed with the SEC a registration statement on Form S-11 on May 27, 2014; Amendment No. 1 to Form S-11/A on June 17, 2014; Amendment No. 2 to Form S-11/A on June 23, 2014; Form S-11MEF on June 25, 2014, and a prospectus on Form 424B4 on June 26, 2014 (the "June 2014 SPO Prospectus"). Brixmor's "June 2014 SPO Registration Statement" refers to the Registration Statement on Form S-11 (File No. 333-196288), as amended, which was declared effective by the Commission on June 25, 2014 and was signed by the Individual Defendants.

* * *

> Same Property NOI for the second quarter increased 3.8% from the comparable 2013 period primarily due to growth in rental income driven by improved leasing spreads as the Company continues to harvest the below-market leases inherent in its portfolio.  For the first six months of 2014, same property NOI increased 3.8% from the comparable 2013 period.  In addition, annualized base rent per square foot for the portfolio increased to $12.04 at June 30, 2014 from $11.83 in the year ago period.

96.    In the earnings press release, Defendant Carroll boasted that the Company's "efforts continue to produce results higher than the industry as demonstrated by our same property NOI growth in the quarter."

97.    Also on August 5, 2014, the Company filed its Form 10-Q for the second quarter of 2014 ("2Q 2014 Form 10-Q"), which was signed by the Individual Defendants and reiterated Brixmor's previously reported financial results.

98.    On August 6, 2014, the Company held a conference call to discuss its financial results for the second quarter of 2014, wherein Defendant Carroll touted not only the Company's "eighth consecutive quarter" reporting in excess of 3.5% same property NOI growth, but also its consistency:

> Our goal was to deliver consistency that emanates from the simplicity that we created.  The guidance range we have provided for same-property NOI and FFO were the narrowest in the sector at 40 basis points and $0.04 respectively.  We don't believe in an under-promise and over-deliver approach.  The simplicity that we have created doesn't require that we protect our earnings expectations.  By having wholly owned assets with contractual leases, we can forecast earnings accurately.  And as importantly, Brixmor offers a unique perspective in portfolio growth.
>
> We have a steady state portfolio with a large same property pool that is delivering consistent organic growth.  We have now achieved same property NOI growth in excess of 3.5% for the eighth consecutive quarter reporting strong 3.8% growth this quarter driven again by increasing rents.  Helping drive our rents is solid leasing spreads, with this being the fourth consecutive quarter with blended spreads of 11% or higher.  I am not aware any other company in our space that can make these statements.  As I said, we are consistent, transparent and easy to understand.

99.    Also during the 2Q 2014 earnings call, Defendant Pappagallo stated the following regarding same property NOI growth and the Company's portfolio:

> Consistent with recent trends, rental growth was the primary driver in our same property NOI result, with additional impact from improved operating expense recoveries. The portfolio metrics underscore and bear out the positive operating environment and the opportunity that is specific to our portfolio.

100.    Analysts emphasized the importance of Brixmor's consistent quarterly same property NOI growth.  For instance, on August 5, 2014, KeyBanc Capital Markets released a report in which it stressed the value of the Company's "predictable results" and "steady" same property NOI growth: "Since the completion of the Company's IPO on November 4, 2013, management has executed well and is on its way to establishing a solid track record of producing predictable results, in our opinion.  During the quarter, SSNOI growth was steady at 3.8%." Similarly, Wells Fargo's report on August 6, 2014 emphasized that "consistency and accuracy are the most important factors for BRX this year given its short time as a public company; as such, we expect BRX shares to outperform peers in trading today."

101.    Defendants' statements identified above in ¶¶95-99 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth, when in reality same property NOI growth was highly volatile and fluctuated wildly from quarter to quarter.  *See* ¶¶45, 51.  Specifically, at the end of the Class Period, Brixmor admitted that its same property NOI growth for the second quarter of 2014 was in reality 3.6%, not 3.8%—an overstatement of 5.6%.  Further, Brixmor's 2Q 2014 results did not demonstrate sustained positive momentum, as there was actually a decrease in growth from the prior quarter—1Q 2014 (actual same property NOI rate of 3.9%) to 2Q 2014 (actual same property NOI rate of 3.6%).  Additionally, Defendants' statements that 2Q

2014 marked an "eighth consecutive quarter of growth over 3.5%" was highly false and misleading, as in reality Brixmor only recorded 2.7% same property NOI growth in the fourth quarter of 2013 (meaning that 2Q14 marked only two consecutive quarters of growth over 3.5%). Furthermore, as a result of these manipulations, Defendants' statements regarding the supposed "consistency" of Brixmor's same property NOI growth were materially false and misleading when made.

        **F.**      **September 2014 Barclays Global Financial Services Conference**

102.    On September 8, 2014, Defendant Pappagallo presented at the Barclays Global Financial Services Conference in New York, New York.  During the presentation, Defendant Pappagallo made the following statements regarding same property NOI growth:

> Our second quarter had an increase in funds from operations of 12%.  <u>And most importantly, 12 consecutive quarters of positive same property NOI growth, 3.8% in the second quarter of the year as well as year to date.  And we've been averaging between 3.8% and 4% the last two years, one of the highest in the sectors</u>.
>
>                             * * *
>
> So if you piece it all together, <u>when we think about our same store net operating income growth, we expect a contribution in total of 3.5% to 4%, which we feel is clearly at the high end of the peer set as we move forward</u>.

103.    Defendant Pappagallo's statements identified above in ¶102 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  Specifically, Defendants' statement that Brixmor had "3.8% growth in the second quarter of the year" was false as Brixmor actually had only 3.6% growth.

### G.     Third Quarter 2014 Financial Results

104.    On October 27, 2014, the Company issued a press release announcing the

Company's financial results for the third quarter ended September 30, 2014 ("3Q 2014"), which

noted that Brixmor "Achieves Strong Same Property NOI Growth of 3.9%":

> Favorable activity continued in the third quarter of 2014 with same property NOI
> increasing 3.9%, the ninth consecutive quarter of growth over 3.5%, and strong
> leasing results.  As a result of Brixmor's operational expertise, new lease volume
> exceeded 1.0 million square feet again in the quarter.  In addition, blended rent
> spreads increased to 13.9%, the highest on record for the Company post initial
> public offering.  Funds from operations per diluted share increased 9.3% over the
> 2013 third quarter.
>
> * * *
>
> Same Property NOI for the third quarter increased 3.9% from the comparable
> 2013 period primarily due to growth in rental income driven by strong leasing
> spreads as the Company continues to harvest the below-market leases inherent in
> its portfolio, as well as occupancy gains.  For the first nine months of 2014, same
> property NOI increased 3.8% from the comparable 2013 period.  In addition,
> annualized base rent ("ABR") per square foot for the portfolio increased to $12.10
> at September 30, 2014 from $11.87 in the year ago period.

105.    On October 28, 2014, Brixmor held a conference call with analysts and investors

to discuss the Company's financial results for the third quarter of 2014.  During the earnings call,

Defendant Carroll emphasized the consistent, strong growth over nine consecutive quarters:

> Our success thus far is evident in the results we have reported since becoming a
> public company. We delivered strong same property NOI growth of 3.9% in the
> quarter. Importantly this is off strong comps in third quarter 2013 when we
> reported 3.5% growth. We have now achieved same property NOI growth in
> excess of 3.5% for the ninth consecutive quarter.

106.    On November 4, 2014, the Company filed its Form 10-Q for the third quarter of

2014 ("3Q 2014 Form 10-Q"), which was signed by the Individual Defendants, certified by

Defendants Carroll and Pappagallo, and reiterated Brixmor's previously reported financial

results.

107.   Defendants' statements identified above in ¶¶104-106 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  Specifically, at the end of the Class Period, Brixmor admitted that its same property NOI growth for the third quarter of 2014 was in reality only 3.1%, not 3.9%—an overstatement of 25.8%.  Thus, Defendants' 3Q 2014 results <u>did not</u> mark the "ninth consecutive quarter of 3.5% growth," as they repeatedly boasted.

108.   The importance of Defendants' fabricated consistency is underscored by the analyst reaction to Brixmor's ninth consecutive quarter of same property NOI growth in excess of 3.5%.  For instance, on October 27, 2014, Wells Fargo issued a report in which it highlighted that "[s]ame-property NOI growth was +3.9% in Q3" and that the Company posted "<u>strong fundamental results</u> that are in line with expectations."  An October 29, 2014 RBC report noted as one of its "key points" that "[t]his quarter saw another solid performance on that front as same store NOI grew a sound 3.9%."  On January 13, 2015, Moody's issued a report in which it "assigns a Baa3 rating to Brixmor OP debt; upgrades Brixmor LLC to Baa3; stable outlook," which noted that the Company was "<u>exhibiting consistently stronger operating performance</u> with Brixmor producing 3.9% same property NOI growth for 3Q14 vs. 3Q13."

109.   Tellingly, after fraudulently reporting its "ninth consecutive quarter of growth over 3.5%"—when, in reality, Brixmor had actually recorded growth of well under 3.5% in <u>two</u> of the previous four quarters—the Company proceeded to conduct three secondary stock offerings and one bond offering in rapid-fire succession over the next two months, raising nearly $2 billion from unsuspecting investors.  These offerings are as follows:

### 1.    November 2014 SPO

110.    On or about November 17, 2014, Brixmor completed a secondary offering in which the Company sold over 28 million shares at $23.75 per share for total proceeds of approximately $683 million (the "November 2014 SPO").

111.    Among other documents, the November 2014 SPO Offering Documents[28] incorporated by reference the Company's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q 2014 Form 10-Q.  Accordingly, the false and misleading statements and omissions included in Brixmor's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q 2014 Form 10-Q were incorporated by reference therein.  These statements continued to be false and misleading and omitted material facts for the same reasons as described above in ¶¶81, 89, 101, 107.

### 2.    December 2014 SPO

112.    On or about December 15, 2014, Brixmor completed a secondary offering in which the Company sold over 5.6 million shares at $24.25 per share for total proceeds of approximately $136 million (the "December 2014 SPO").

113.    Among other documents, the December 2014 SPO Offering Documents[29] incorporated by reference the Company's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q 2014 Form 10-Q.  Accordingly, the false and misleading statements and omissions included in Brixmor's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q 2014

---

[28] The November 2014 SPO was conducted pursuant to the Company's Prospectus dated November 10, 2014 and Prospectus Supplement on Form 424B4 dated November 13, 2014, filed pursuant to Registration No. 333-200057 (together, the "November 2014 Offering Documents"). The shelf registration was signed by the Individual Defendants.

[29] The December 2014 SPO was conducted pursuant to the Company's Prospectus dated November 10, 2014 and the Final Prospectus Supplement on Form 424B4 filed December 11, 2014, filed pursuant to Registration No. 333-200057 (the "December 2014 Offering Documents").  The shelf registration was signed by the Individual Defendants.

Form 10-Q were incorporated by reference therein.  These statements continued to be false and misleading and omitted material facts for the same reasons as described above in ¶¶81, 89, 101, 107.

### 3.   January 2015 SPO

114.   On or about January 15, 2015, Brixmor completed a secondary offering in which the Company sold over 17.5 million shares at $26.15 per share for total proceeds of approximately $458 million (the "January 2015 SPO").

115.   Among other documents, the January 2015 SPO Offering Documents[30] incorporated by reference the Company's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q 2014 Form 10-Q.  Accordingly, the false and misleading statements and omissions included in Brixmor's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q 2014 Form 10-Q were incorporated by reference therein.  These statements continued to be false and misleading and to omit material facts for the same reasons as described above in ¶¶81, 89, 101, 107.

### 4.   January 2015 Offering of 3.850% Senior Notes due 2025

116.   On or about January 21, 2015, the Operating Partnership completed the offering of $700,000,000 aggregate principal amount of 3.850% Senior Notes due 2025.

117.   The 3.850% Senior Notes due 2025 Offering Documents[31] incorporated by reference the Company's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q

---

[30] The January 2015 SPO was conducted pursuant to the Company's Prospectus dated November 10, 2014 and the Final Prospectus Supplement on Form 424B2 filed January 15, 2015, filed pursuant to Registration No. 333-200057 (the "January 2015 Offering Documents").  The shelf registration was signed by the Individual Defendants.

[31] The January 2015 offering of the 3.850% Senior Notes due 2025 was conducted pursuant to the Operating Partnership's Prospectus dated January 13, 2015 and Final Prospectus Supplement on Form 424B2 filed January 15, 2015, filed pursuant to Registration No. 333- 201464-01 (the

2014 Form 10-Q.  Accordingly, the false and misleading statements and omissions included in Brixmor's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q 2014 Form 10-Q were incorporated by reference therein.  These statements continued to be false and misleading and omitted material facts for the same reasons as described above in ¶¶81, 89, 101, 107.

### H.   February 2015 Devonshire REIT Symposium

118.   Having successfully completed the offerings discussed above, Defendants continued to publicly highlight the fact that Brixmor had supposedly reported "nine consecutive quarters of same property NOI growth in excess of 3.5%."  For instance, from February 4, 2015 through February 6, 2015, Devonshire REIT, Inc. hosted its Inaugural Fiduciary Commercial Real Estate Symposium.  One of the speakers at the symposium was Defendant Carroll, who made a presentation entitled "Shopping Center Landscape."  The slides that Carroll presented featured the Company's consecutive streak of quarterly same property NOI growth.  Specifically, on the slide entitled "REIT Performance Drivers," Carroll highlighted the Company's "9 consecutive quarters of same property NOI growth in excess of 3.5%," including that Brixmor achieved "3.9% in 3Q2014."

119.   Defendant Carroll's statement identified above in ¶118 was false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  In reality, Brixmor did not deliver "9 consecutive quarters of same property NOI growth in excess of 3.5%."  To the contrary, same property NOI growth was well below 3.5% in both the prior quarter and in Q4 2013.  Brixmor's touting of "3.9% in 3Q2014" was also false and misleading as same property

---

"3.850% Senior Notes due 2025 Offering Documents").  The shelf registration was signed by the Individual Defendants.

NOI growth for the third quarter of 2014 was in reality 3.1%, not 3.9%—an overstatement of 25.8%.

I.       **Fourth Quarter 2014 Financial Results**

120.     On February 9, 2015, Brixmor issued a press release announcing the Company's financial results for the fourth quarter 2014 ("4Q 2014") and year ended December 31, 2014, which noted that Brixmor had achieved its "tenth consecutive quarter of growth over 3.5%" in same property NOI:

> Operating metrics continued their positive trajectory in the fourth quarter of 2014 with healthy leasing results and same property NOI increasing 3.9%, the tenth consecutive quarter of growth over 3.5%.

121.     The next day, on February 10, 2015, the Company held a conference call to discuss its financial results for 4Q 2014, wherein Defendant Carroll again emphasized the Company's tenth consecutive quarter of same property NOI growth, and boasted that none of Brixmor's competitors could make that same claim:

> Strong leasing results throughout the year have successfully boosted our tenant mix, average base rent and occupancy rates. Driving our continued organic growth with same property NOI of 3.9% in both the fourth quarter and year. This marks the 10th consecutive quarter of same property NOI growth in excess of 3.5%. No other sector peer can make this statement. We expect to continue to drive strong NOI growth in the 2015, as we capitalize on the long-term opportunity embedded within our portfolio.

122.     In connection with the filing of the Company's 2014 Form 10-K on February 19, 2015, Brixmor released its 2014 Annual Report, which included a letter to shareholders from Defendant Carroll. In his letter, Defendant Carroll yet again boasted that the Company had now purportedly achieved ten straight quarters of same property NOI growth of more than 3.5%:

> **SOLID FINANCIAL PERFORMANCE**
>
> Fueled by the strong performance of our operating metrics, we achieved same property NOI growth of 3.9 percent in 2014, and have delivered 10 consecutive quarters of same property NOI growth in excess of 3.5 percent. This consistent

NOI growth has been primarily driven by strong rental rate increases, with occupancy gains adding incrementally. During 2014, we realized total lease spreads for both new and renewal leases of 12.6 percent and new lease spreads of 31.2 percent. While many of our peers report similar rent and NOI metrics, our revenue increases actually translate into real earnings growth.

123.    Defendants' statements identified above in ¶¶120-122 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  In reality, Brixmor did not "deliver[] 10 consecutive quarters of same property NOI growth in excess of 3.5 percent"—to the contrary, same property NOI growth was well below 3.5% in the prior quarter and in the fourth quarter of 2013.  Thus, Brixmor's 4Q14 actually represented only <u>one</u> consecutive quarter of same property NOI growth in excess of 3.5%, not ten.

## J.    March 2015 Citi Global Property CEO Conference

124.    On March 4, 2015, Defendants Carroll and Pappagallo presented at the Citi Global Property CEO Conference in Hollywood, Florida.  During the presentation, Carroll stated the following in regards to the Company's same property NOI growth:

> And we are now **--** <u>our entire time as a public Company I think we have been [3.8%] or better on same property NOI growth and 10 quarters running above 3.5%. It is just a very consistent portfolio</u> that has a below market aspect to it that we feel like we can continue to drive -- to drive that growth from.

125.    Defendant Carroll's misrepresentations resonated with the market.  For instance, on March 16, 2015, *SeekingAlpha.com* published an article in which it emphasized that one of the "catalysts support[ing] the argument that Brixmor is a stock worth owning" is its "<u>sector leading NOI growth</u>," noting that the Company "<u>has reported 10 consecutive quarters of same property NOI growth in excess of 3.5%</u>."  This metric in part led to the conclusion that "<u>Brixmor can be viewed as an attractive REIT</u>."

126.    Defendant Carroll's statements identified above in ¶124 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  Specifically, at the end of the Class Period, Brixmor adjusted its previously-reported same property NOI growth throughout the Class Period, revealing that Brixmor had not been 3.8% or better on same property NOI growth for its entire time as a public company, and did not have "10 quarters running above 3.5%."  Additionally, Defendant Carroll's statement that Brixmor had a "very consistent portfolio" is false because in reality same property NOI was highly volatile and fluctuated dramatically from quarter to quarter.

### K.    March 2015 SPO

127.    On or about March 24, 2015, Brixmor completed yet another offering of stock.  Specifically, the Company sold over 25.9 million shares at $26.38 per share for total proceeds of approximately $683 million (the "March 2015 SPO").

128.    Among other documents, the March 2015 Offering Documents[32] incorporated by reference the Company's 2014 Form 10-K, 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q 2014 Form 10-Q.  Accordingly, the false and misleading statements and omissions included in Brixmor's 2014 Form 10-K, 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, and 3Q 2014 Form 10-Q were incorporated by reference therein.  These statements continued to be false and misleading and omitted material facts for the same reasons as described above in ¶¶81, 89, 101, 107, 123.

---

[32] The March 2015 SPO was conducted pursuant to the Company's Prospectus dated November 10, 2014 and the Final Prospectus Supplement on Form 424B4 filed March 24, 2015, filed pursuant to Registration No. 333-200057 (the "March 2015 Offering Documents").  The shelf registration was signed by the Individual Defendants.

**L.    First Quarter 2015 Financial Results**

129.    On April 27, 2015, Brixmor issued a press release announcing the Company's

financial results for the first quarter ended March 31, 2015 ("1Q 2015"), disclosing, in pertinent

part:

> Same property net operating income ("same property NOI") increased 3.4%,
> notwithstanding a 40 basis point negative impact related to proactive
> remerchandising activities, including the Company's previously announced early
> termination of certain Kmart leases and other recapturing of space.

130.    Also on April 27, 2015, the Company filed with the SEC its Form 10-Q for first

quarter of 2015 ("1Q 2015 Form 10-Q"), which was signed by the Individual Defendants and

reiterated Brixmor's previously reported financial results.

131.    On April 28, 2015, Brixmor held a conference call with analysts and investors to

discuss the Company's first quarter 2015 financial results.  During the call, Defendant Carroll

highlighted the consistent growth in same property NOI:

> NOI has been positive in this company every quarter since they acquired us 15
> straight quarters. The last 12 quarters have been 3.4% or better.

132.    Defendants' statement identified above in ¶131 was false and misleading, and

omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's

senior executives were smoothing income items between reporting periods to create the illusion

of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  Moreover, Defendants'

statement that Brixmor had twelve straight quarters of same property NOI growth in excess of

3.4% was materially false and misleading because, in reality, the Company's same property NOI

growth was well below 3.4% in both the third quarter of 2014 and the fourth quarter of 2013.

**M.    June 2015 REITWeek NAREIT Investor Forum**

133.    On June 10, 2015, Defendants Carroll and Pappagallo presented at the REITWeek

2015 NAREIT Investor Forum in New York, New York.  During the presentation, Carroll again

falsely asserted that Brixmor had 11 straight quarters of same property NOI growth of 3.4% or better—results that he stressed were "unmatched" by any of Brixmor's competitors:

> We've had 15 straight quarters of topline revenue growth. <u>We've had 11 quarters of 3.4% or better same-property NOI and those are things that are generally unmatched in the space today . . . And so we feel very good about the transparency and the simplicity of the company,</u> the lack of dilution that exists in the company, it's really just a very straightforward proposition.

134.   Defendant Carroll's statements identified above in ¶133 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  Moreover, Defendants' statement that Brixmor had eleven straight quarters of same property NOI growth in excess of 3.4% was materially false and misleading because, in reality, the Company's same property NOI growth was well below 3.4% in both the third quarter of 2014 and the fourth quarter of 2013.

**N.   Second Quarter 2015 Financial Results**

135.   On July 27, 2015, Brixmor issued a press release announcing the Company's financial results for the second quarter ended June 30, 2015 ("2Q 2015"):

> Same Property NOI
>
> <u>Same property NOI for the three months ended June 30, 2015 increased 3.6% from the comparable 2014 period</u> due to growth in rental income driven by strong leasing spreads as the Company continues to harvest the below-market leases inherent in its portfolio, as well as from operating expense savings.
>
> <u>Same property NOI for the first six months of 2015 increased 3.5% from the comparable 2014 period</u>.

136.   In the earnings press release, Defendant Carroll commented on the Company's financial results, stating, in pertinent part:

"Our same property net operating income ("same property NOI") growth of 3.6% underscores our outstanding internal growth and the significant mark-to-market opportunity in our portfolio."

137.    On July 28, 2015, Brixmor held a conference call with analysts and investors to discuss the Company's second quarter 2015 financial results.  During the call, Defendant Carroll asserted:

Third, we're an NOI and earnings growth story. Same property NOI growth which was 3.6% this quarter and 3.5% year-to-date, will continue to reflect a larger portion of rent growth, with occupancy gains on the margin coming mainly from small shops as we rotate our anchors to best-in-class. Simply put, we're growing cash flow while at the same time repositioning our portfolio for the long term.

138.    During the call, Defendant Pappagallo added:

Same property NOI accelerated from last quarter, reaching 3.6%, the consequence of higher rental income from improved lease rates, a product of our raising-the-bar initiative and better-than-expected tenant retention which reduced downtime, as well as lower operating expenses and bad debt provisions.

139.    Defendants' statements identified above in ¶¶135-138 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.

### O.   August 2015 Offering of 3.875% Senior Notes due 2022

140.    On or about August 10, 2015, the Operating Partnership completed an offering of $500,000,000 aggregate principal amount of 3.875% Senior Notes due 2022.

141.    The 3.875% Senior Notes due 2022 Offering Documents[33] incorporated by reference the Company's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, 3Q 2014

---

[33] The offering of the 3.875% Senior Notes due 2022 was conducted pursuant to the Operating Partnership's Prospectus dated January 13, 2015 and Final Prospectus Supplement on Form 424B2 filed August 3, 2015, filed pursuant to Registration No. 333-201464-01 (the "3.875%

Form 10-Q, 2014 Form 10-K, 1Q 2015 Form 10-Q and 2Q 2015 Form 10-Q.  Accordingly, the false and misleading statements and omissions included in Brixmor's 2013 Form 10-K, 1Q 2014 Form 10-Q, 2Q 2014 Form 10-Q, 3Q 2014 Form 10-Q, 2014 Form 10-K, 1Q 2015 Form 10-Q, and 2Q 2015 Form 10-Q were incorporated by reference therein.  These statements continued to be false and misleading and to omit material facts for the same reasons as described above in ¶¶81, 89, 101, 107, 123, 132, 139.

> **P.**    **September 2015 Bank of America Merrill Lynch Conference**

142.    On September 17, 2015, Defendant Carroll presented at the Bank of America 2015 Merrill Lynch Global Real Estate Conference in New York, New York.  During Carroll's presentation, he again touted the Company's purported stability in same property NOI growth, as evidenced by the fact that Brixmor had reported twelve consecutive quarters of same property NOI growth of 3.4% or better, stating the following:

> And that's what we've been doing, what's been driving our business. Our business has been incredibly steady. We've been now 12 quarters running of 3.4% same-property NOI growth or better. And it's revenue-driven and NOI-driven; that's total portfolio, and that translates into earnings. I think that's one of the other -- with the simplicity of our Company, everything we get on the top line flows through to earnings.

143.    Defendant Carroll's statement identified above in ¶142 was false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  Moreover, Defendant Carroll's statement that Brixmor had twelve straight quarters of same property NOI growth in excess of

---

Senior Notes due 2022 Offering Documents").   The shelf registration was signed by the Individual Defendants.

3.4% was materially false and misleading because, in reality, the Company's same property NOI

growth was well below 3.4% in both the third quarter of 2014 and the fourth quarter of 2013.

### Q.   September 2015 Barclays Global Financial Services Conference

144.   On September 17, 2015, Defendant Pappagallo presented at the Barclays Global

Financial Services Conference in New York, New York.   During his presentation, Pappagallo

stated the following regarding same property NOI growth:

> [S]ame-property NOI, which is certainly a metric which is looked at very, very
> carefully by REIT investors, it's been at or above 3.4% for 12 quarters. Very
> consistent same-property NOI growth coming from our primary drivers.

145.   Defendant Pappagallo's statements identified above in ¶144 were false and

misleading, and omitted material facts when made.   As Brixmor has admitted (*see* ¶¶46-52), the

Company's senior executives were smoothing income items between reporting periods to create

the illusion of consistent quarterly same property NOI growth.   *See* ¶¶45, 51.   Specifically, at the

end of the Class Period, Brixmor admitted that it did not have 12 quarters of growth of 3.4% or

better as the Company was well below 3.4% in both Q4 2013 and Q3 2014.   Furthermore,

Defendant Pappagallo's statement regarding "consistent Same Property NOI growth" created the

false impression that the Company's same property NOI growth was consistent when, in truth,

the Individual Defendants had completely manipulated the metric.

### R.   Third Quarter 2015 Financial Results

146.   On October 26, 2015, Brixmor issued a press release announcing the Company's

financial results for the third quarter ended September 30, 2015 ("3Q 2015"), which noted that

Brixmor "Achieves Same Property NOI Growth of 3.6%":

> Same Property NOI
>
> Same property NOI for the three months ended September 30, 2015 increased
> 3.6% from the comparable 2014 period due to growth in rental income driven by

strong leasing spreads as the Company continues to harvest the below-market leases inherent in its portfolio.

147.    In the earnings press release, Defendant Carroll commented on the Company's financial results as follows:

"Our operating performance continues to demonstrate the internal growth opportunity embedded within our portfolio, and when combined with our Raising the Bar efforts, drives value creation within the Brixmor enterprise. The ongoing transformation of our portfolio is evident in our results with same property net operating income ("same property NOI") growing 3.6% . . ."

148.    Also on October 26, 2015, the Company filed with the SEC its Form 10-Q for the third quarter of 2015 ("3Q 2015 Form 10-Q"), which was signed by the Individual Defendants and reiterated Brixmor's previously reported financial results.

149.    On October 27, 2015, the Company held a conference call with analysts and investors to discuss the third quarter 2015 financial results.   During the call, Defendant Pappagallo underscored the consistency of same property NOI:

Last quarter, I began my prepared remarks using the wor[d] consistency to describe our financial results and I'm pleased to be able to use that word again. Our same property NOI growth remains strong, resilient and consistent.

Year-to-date NOI growth was 3.5%, a quarterly rate of 3.6% and an overall average of 3.9% over the past three years with every quarter at least 3.4% underlies that consistency.

150.    Defendants' statements identified above in ¶¶146-149 were false and misleading, and omitted material facts when made.  As Brixmor has admitted (*see* ¶¶46-52), the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth.  *See* ¶¶45, 51.  Specifically, at the end of the Class Period, Brixmor admitted that its same property NOI growth for the third quarter of 2015 was in reality 3.3%, not 3.6%—an overstatement of 9.1%.  Moreover, Brixmor did not have "every quarter [with] at least 3.4%," as the Company was yet again below 3.4%, and also was

well below 3.4% in both the fourth quarter of 2013 and the third quarter of 2014. In fact, the Company's same property NOI was below 3.4% in <u>three</u> of the last <u>eight</u> quarters. Thus, Defendants' financial results <u>did not</u> demonstrate sustained "consistency" as the Individual Defendants had completely manipulated the metric.

### S.    <u>Defendants' False Statements Regarding Internal Controls</u>

151.    Each of Brixmor's subsequent quarterly and annual reports filed with the SEC (as described herein) contained certifications signed by Defendants Carroll and Pappagallo pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting that the financial information contained in the filing was true, did not omit material facts, and that the Company's internal and disclosure controls were effective. Specifically, the SOX certifications included in Brixmor's 2013 Form 10-K provided the following, in relevant part:

> 1. I have reviewed this annual report on Form 10-K for the fiscal year ended December 31, 2013 of Brixmor Property Group Inc.;
>
> 2. Based on my knowledge, <u>this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report</u>;
>
> 3. Based on my knowledge, <u>the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant</u> as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), for the registrant and have:
>
>> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to <u>ensure that material information relating to the registrant,</u> including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> b) Evaluated the effectiveness of the registrant's disclosure controls and

procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) <u>Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter</u> (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) <u>All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting</u> which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) <u>Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.</u>[34]

152.    Beginning in the Company's 2014 Form 10-K, Brixmor's SOX certification including the following, in addition to the above representations:

Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, <u>to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;</u>

153.    Moreover, Brixmor's SEC filings stated the following in regards to the Company's Controls and Procedures:

**Controls and Procedures**

---

[34] 2013 Form 10-K at Exhibits 31.1 and 31.2. This statement was repeated in substantially similar form in the Company's filings throughout the Class Period, including in the following: 1Q 2014 Form 10-Q at Exhibits 31.1 and 31.2; 2Q 2014 Form 10-Q at Exhibits 31.1 and 31.2; 3Q 2014 Form 10-Q at Exhibits 31.1 and 31.2; 2014 Form 10-K at Exhibits 31.1 and 31.2; 1Q 2015 Form 10-Q at Exhibits 31.1 and 31.2; 2Q 2015 Form 10-Q at Exhibits 31.1 and 31.2; and 3Q 2015 Form 10-Q at Exhibits 31.1 and 31.2.

**Evaluation of Disclosure Controls and Procedures**

<u>We maintain disclosure controls and procedures</u> (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) <u>that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported</u> within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosures. Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based upon that evaluation, <u>our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, the design and operation of our disclosure controls and procedures were effective to accomplish their objectives</u> at the reasonable assurance level.

\* \* \*

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2013 <u>that have materially affected, or that are reasonably likely to materially affect, our internal control over financial reporting.</u>[35]

154.    Additionally, the Company's 2014 Form 10-K included a section discussing

Brixmor's "Control and Procedures," which stated in pertinent part:

***Management's Report on Internal Control Over Financial Reporting***

<u>BPG's management is responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of BPG's financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.</u> BPG's internal control over financial reporting includes policies and procedures that pertain to the maintenance of records that in reasonable detail <u>accurately and fairly reflect</u> the transactions and dispositions of BPG's assets; <u>provide reasonable assurance that transactions are recorded as</u>

---

[35] 2013 Form 10-K at 72-73.  This statement was repeated in substantially similar form in the Company's filings throughout the Class Period, including in the following: 1Q 2014 Form 10-Q at 33-34; 2Q 2014 Form 10-Q at 38-39; 3Q 2014 Form 10-Q at 38-39; 2014 Form 10-K at 57; 1Q 2015 Form 10-Q at 36; 2Q 2015 Form 10-Q at 41; and 3Q 2015 Form 10-Q at 41.

<u>necessary to permit preparation of financial statements in accordance with</u> <u>generally accepted accounting principles</u>, and that receipts and expenditures of BPG are being made only in accordance with authorizations of management and directors of BPG; and provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of its assets that could have a material effect on BPG's financial statements.

* * *

Under the supervision and with the participation of its management, including <u>its</u> <u>chief executive officer and chief financial officer, BPG conducted an evaluation</u> <u>of the effectiveness of its internal control over financial reporting based on the</u> <u>framework in Internal Control - Integrated Framework (2013) issued by the</u> <u>Committee of Sponsoring Organizations of the Treadway Commission. Based on</u> <u>its evaluation under the framework in Internal Control - Integrated Framework</u> <u>(2013), BPG's management concluded that its internal control over financial</u> <u>reporting was effective as of December 31, 2014</u>.

155.    Defendants' representations concerning Brixmor's internal controls identified above in ¶¶151-154 were false and misleading, and omitted material facts.  Specifically, Brixmor admitted that the Company's senior executives were smoothing income items between reporting periods to create the illusion of consistent quarterly same property NOI growth, and that this manipulation took place under a control environment that was plagued by a "material weakness" in internal control over financial reporting, leading the Company to conclude that its disclosure controls and procedures, and internal control over financial reporting, were not effective. Moreover, despite their certifications to the contrary, Brixmor explicitly confirmed that the Individual Defendants were directly involved in the Company's internal control deficiencies, admitting that the "<u>override of controls [] occurred at senior levels of management</u>."

## VI.    <u>BRIXMOR'S VIOLATIONS OF GAAP AND SEC REGULATIONS</u>

### A.    <u>Defendants' Misstatements Violated SEC Regulations and GAAP</u>

156.    During the Class Period, Defendants represented that Brixmor's financial statements were prepared in conformity with GAAP.  GAAP are recognized by the accounting

profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practices at a particular time.

157.    Brixmor's materially false and misleading statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding Brixmor's actual operating results.   Throughout the Class Period, Defendants portrayed Brixmor as delivering "strong, resilient and consistent" quarterly same property NOI growth.   In order to perpetuate this portrayal, from prior to the IPO in October 2013 through the third quarter of 2015, Brixmor misstated its same property NOI, a non-GAAP financial measure, by improperly "smoothing income items between reporting periods in a manner contrary to GAAP."[36]

158.    As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented.  FASB Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

159.    The SEC permits companies to present non-GAAP financial measures in their periodic reports filed under the Securities Exchange Act of 1934, subject to compliance with Regulation G.[37]   Regulation G includes the following discussion regarding the consistency of calculating and presenting non-GAAP financial measures:

---

[36]  The SEC has promulgated regulations directly related to the disclosure of non-GAAP measures, such as same property NOI.  Regulation G applies whenever a company publicly discloses or releases material information that includes a non-GAAP financial measure.

[37]  http://www.sec.gov/rules/final/33-8176.htm

[R]egistrants should consider whether a change in the method of calculating or presenting a non-GAAP financial measure from one period to another, without a complete description of the change in that methodology, complies with the requirement of Regulation G that a registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

160.    The SEC recently reiterated its guidance concerning consistency of presentation on non-GAAP financial measures:

Question 100.02

Question: Can a non-GAAP measure be misleading if it is presented inconsistently between periods?

Answer: Yes. For example, a non-GAAP measure that adjusts a particular charge or gain in the current period and for which other, similar charges or gains were not also adjusted in prior periods could violate Rule 100(b) of Regulation G unless the change between periods is disclosed and the reasons for it explained. In addition, depending on the significance of the change, it may be necessary to recast prior measures to conform to the current presentation and place the disclosure in the appropriate context.[38]

161.    The actions by Defendants also violated two of the basic tenets of GAAP—consistency and comparability.  FASB Concepts Statement No. 6, paragraph 120 states that "[c]onsistency in applying accounting methods over a span of time has always been regarded as an important quality that makes accounting numbers more useful."  Regarding comparability, Concepts Statement No. 6, paragraph 111 states that "[i]nformation about an enterprise gains greatly in usefulness if it can be compared . . . with similar information about the same enterprise for some other period or some other point in time."

---

[38] SEC, *Non-GAAP Financial Measures - Questions And Answers Of General Applicability* (May 17, 2016); https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

162.    Defendants, however, engaged in smoothing income items between reporting periods in a manner contrary to Regulation G and GAAP "in an effort to achieve consistent quarterly same property net operating income growth. . . ."

163.    As a result of the accounting improprieties detailed above, Defendants caused Brixmor's reported financial reporting to violate, among other things, the following provisions of GAAP for which each Defendant is necessarily responsible:

a.    The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶34);

b.    The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Statement of Concepts No. 2, ¶132);

c.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (FASB Statement of Concepts No. 1, ¶50);

d.    The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based on evaluations of past enterprise performance.  (FASB Statement of Concepts No. 1, ¶42);

e.    The principle that financial reporting should be reliable in that it represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting. (FASB Statement of Concepts No. 2, ¶¶58-59);

f.     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (FASB Statement of Concepts No. 2, ¶80);

g.     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (FASB Statement of Concepts No. 2, ¶¶95, 97); and

h.     The principle that contingencies that might result in gains are usually not reflected in the financial statements because to do so might be to recognize revenue prior to its realization.  (Accounting Standards Codification 450, *Contingencies*).

164.    Accordingly, Defendants' material misstatements and omissions throughout the Class Period had the cause and effect of creating in the market an unrealistically positive assessment of Brixmor and its business operations.  Such misrepresentations violated the GAAP and SEC regulations outlined above.

**B.    <u>Brixmor's Ineffective Disclosure Controls and Internal Control Over Financial Reporting</u>**

165.    Disclosure controls and procedures are designed to ensure that information required to be disclosed pursuant to the rules mandated by the SEC is appropriately recorded, processed, and summarized.  Item 307 of Regulation S-K, Disclosure Controls and Procedures, required that Brixmor's Forms 10-K and 10-Q disclose the conclusions of its principal executive and financial officers regarding the effectiveness of the Company's disclosure controls and procedures.  17 C.F.R. §229.307.

166.    Internal control over financial reporting is broadly defined as a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance that, among other things, the entity's financial reporting is reliable and accurate.  Item 308 of Regulation S-K, Internal Control Over Financial Reporting, required that

Brixmor's Forms 10-K and 10-Q disclose, among other things, the assessment made by its management concerning the effectiveness of Brixmor's internal control over financial reporting. 17 C.F.R. §229.308.

167.   As detailed herein, from the beginning of the Class Period through the filing of Brixmor's Form 10-Q for the quarter ended September 30, 2015, Defendants falsely and misleadingly represented that the Company's disclosure and internal controls were operating effectively when, as Brixmor has now admitted, they suffered from material weaknesses.

168.   On February 29, 2016, Brixmor's 2015 Form 10-K acknowledged that the Company's disclosure controls and procedures were ineffective, and that the Company's system of internal control over financial reporting suffered from a material weakness:

> <u>We have identified a material weakness in our internal control over financial reporting and our management has concluded that our disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2015.</u> If not remediated, our failure to establish and maintain effective disclosure controls and procedures and internal control over financial reporting could result in a material misstatement in our financial statements or a failure to meet our reporting and financial obligations, each of which could have a material adverse effect on our financial condition and the trading price of our common stock.
>
> Maintaining effective internal control over financial reporting and effective disclosure controls and procedures are necessary for us to consistently produce reliable financial statements and financial reports. If we cannot provide reliable financial reports or prevent fraud, our reputation and operating results would be harmed. The Company's current management concluded, and our independent registered public accounting firm has concurred, that as a result of a material weakness in internal control over financial reporting at the evaluation date, the Company's disclosure controls and procedures and internal control over financial reporting were not effective at December 31, 2015. The material weakness relates to a deficiency in the control environment specifically because the actions identified in the Audit Committee review failed to demonstrate commitment to integrity and ethical values and senior management did not set an appropriate tone at the top.
>
> (emphasis in original).

169.    In addition, the 2015 Form 10-K disclosed that "because of the override of controls that occurred at senior levels of management, <u>we have concluded that the potential for material misstatement of the financial statements was more than remote. Accordingly, management has determined that this control deficiency constitutes a material weakness</u>."

170.    Brixmor's ineffective internal financial and disclosure controls thus violated SEC regulations and contributed to the perpetration of the Company's fraud.

C.    **Defendants' False Statements Concerning NOI Were Material**

171.    Brixmor has admitted that the Company's representations concerning its same property NOI during the Class Period were false and misleading, and that the Company suffered from a material weakness in its internal financial and disclosure controls.  In connection with Brixmor's revelations, Defendants attempted to downplay the NOI manipulation by stating that the amounts involved were not material to the Company's GAAP financial results.  However, the misstatements of the Company's same property NOI are undoubtedly qualitatively material.

172.    Indeed, Defendants' own statements demonstrate that they knew that same property NOI growth was a critical metric for investors and, in fact, encouraged investors to rely on this measure to evaluate Brixmor's financial performance.  For instance, throughout the Class Period, Defendants stated that "<u>same property NOI is helpful to investors</u> as a measure of our operational performance."  In fact, Defendants affirmatively represented that same property NOI "<u>provides a more consistent metric for comparing the performance of our properties</u>."  As a result, same property NOI "<u>is frequently used by securities analysts, investors and other interested parties in understanding business and operating results regarding the underlying economics of our business operations</u>."  Underscoring the materiality of same property NOI, the Individual Defendants repeatedly boasted about Brixmor's streak of consecutive quarters of

same property NOI growth above 3.5%, and that this consistency was "<u>unlike a lot of other</u> <u>people in this space</u>," "<u>unmatched in the space today</u>," and that  "<u>no other sector peer can make</u> <u>this statement</u>."

173.    Moreover, as discussed above, immediately following Brixmor's stunning revelations, analysts in near-unison decried the intentional misconduct on the part of the Company's executives.  For instance, an analyst at Sandler O'Neill & Partners LP immediately downgraded Brixmor's shares, and noted that the executive departures were "a complete shock," and that these executives "risk[ed] everything to fudge" the Company's numbers.  A SunTrust report noted that same property NOI growth was central to the Company's investment "story," and that "volatile" same property NOI results "<u>could have been damaging to that thesis or</u> <u>image</u>."  Other analysts voiced doubt concerning Brixmor's characterization of the impact of the misconduct.  For example, a Vice President at Audit Analytics stated: "This is the first case that I've seen where an accounting issue is supposedly immaterial to GAAP [and] is potentially material to the non-GAAP results."

174.    The analyst dialogue concerning the materiality of the NOI fabrications is actually rooted in the accounting literature itself.  For instance, according to the SEC's Staff Accounting Bulletin ("SAB") Topic 1.M, among the considerations that render material a quantitatively small misstatement of a financial statement item, includes "whether the misstatement masks a change in earnings or other trends" or where "the misstatement hides a failure to meet analysts' consensus expectations for the enterprise."  Here, Brixmor executives touted the "consistency" of the Company's NOI growth throughout the Class Period, including noting the consecutive quarters during which the Company posted same property NOI growth of above 3.5%, and then later in the Class Period of over 3.4%.  As discussed above, these executives emphasized this

consistency repeatedly to investors at every turn, and the executives successfully employed these "smoothing" machinations throughout the Class Period.

175.    SAB Topic 1.M notes that "evidence [of materiality] may be particularly compelling where management has intentionally misstated items in the financial statements to 'manage' reported earnings."   In this respect, Brixmor has admitted that senior management's "conduct and judgment" were "unacceptable," and that the Individual Defendants lacked a "commitment to integrity and ethical values."

## VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

176.    Numerous facts, in addition to those discussed above, raise a strong inference that Defendants knew or were severely reckless in disregarding the true facts concerning Brixmor's quarterly same property NOI manipulations when disseminating the false and misleading statements discussed herein.

177.    *The Individual Defendants spoke repeatedly about Brixmor's quarterly same property NOI growth.*  The Individual Defendants' central role in the Brixmor accounting fraud is unassailable.  Indeed, these executives spoke repeatedly about the Company's quarterly same property NOI growth throughout the Class Period.  The Individual Defendants even went so far as to feature these financial figures in the Company's communications, including providing a running update of the consecutive quarters in which the Company hit the Individual Defendant-set benchmark of 3.5% quarterly same property NOI growth.

178.    Moreover, on numerous occasions during the Class Period, the Individual Defendants publicly discussed Brixmor's same property NOI growth, and the purported benefits that the reliability and consistency of this metric provided to investors.  In fact, from Brixmor's inception as a public company, the Individual Defendants touted same property NOI as central to

the Company's "investment thesis," and acknowledged that the metric was something that investors "looked at very, very carefully." *See* ¶¶40, 43, 144. Crucially, the Individual Defendants repeatedly stressed to investors that the consistency and reliability of Brixmor's quarterly same property NOI growth rate was the factor that differentiated the Company from its industry peers. *See*, *e.g.*, ¶¶42, 121, 133 (Individual Defendants representing that consistent quarterly same property NOI growth was part of the Company's "secret sauce" that was "unlike a lot of other people in this space," "unmatched in the space today," and that "No other sector peer can make this statement.").

179. Furthermore, the Individual Defendants were well aware of the fact that the market was relying on these statements, as analysts published numerous reports that underscored the Company's consistent and reliable quarterly same property NOI growth (*see* ¶¶4, 44, 62, 80, 88, 100, 108), and asked specific questions about Brixmor's ability to continue producing these results (*see* ¶62,), to which the Individual Defendants provided assuring responses. The Individual Defendants knew, or were severely reckless in not knowing, that Brixmor was not producing the reliable and consistent quarterly NOI growth about which they spoke so frequently.

180. *Brixmor explicitly acknowledged that the Individual Defendants were complicit in the accounting scheme.* At the end of the Class Period, after the Audit Committee investigation uncovered the Individual Defendants' fraud, Brixmor publicly condemned the Individual Defendants' participation in the smoothing scheme. Indeed, the Company made crystal clear that the Individual Defendants "were directly involved and/or supervised persons directly involved" in Brixmor's falsification of quarterly same property NOI, and that such manipulations were effectuated "to achieve consistent quarterly same property net operating income growth."

Remarkably, Brixmor also emphasizing that the misconduct "occurred at senior levels of management"; "that the conduct and judgment exercised by senior management was unacceptable"; and that the Individual Defendants' actions "failed to demonstrate commitment to integrity and ethical values." Brixmor then immediately terminated the Individual Defendants, with the Board acknowledging that these executives' departures "directly related to [the officers'] course of conduct."

181.    *The Individual Defendants participated directly in the setting and reporting of same property NOI growth on a Company-wide level.* Defendants Carroll, Pappagallo and Splain were personally involved in the Company's macro-level review and reporting of same property NOI growth. In fact, as former employees attest, Brixmor was structured in a manner in which the Company's portfolio was separated into three geographical regions (South, North and West), and within each region approximately ten corporate accountants were given responsibility over an approximately equal number of properties (typically 15-20). As discussed above, neither the property accountants, nor the corporate accountants, had insight into the setting of same property NOI metrics on a portfolio-wide basis.

182.    Rather, these lower-level executives were only privy to metrics concerning their comparatively limited section of the much larger Brixmor portfolio. Because of this segmentation, only the most senior executives of Company—*i.e.* the Individual Defendants—had the requisite visibility and access to effectuate the fraudulent NOI manipulations. Accordingly, the Audit Committee investigation found that the Individual Defendants' actions "failed to demonstrate commitment to integrity and ethical values," with the Audit Committee Chairman remarking that the Individual Defendants' "conduct and judgment" was "unacceptable."

183.   *The magnitude, duration and timing of the accounting manipulations are indicative of scienter.*  As explained above, the Individual Defendants perpetrated their quarterly same property NOI "smoothing" scheme throughout the Class Period, and <u>during Brixmor's entire history as a publicly-traded company</u>.   The Individual Defendants manipulated the Company's same property NOI metrics to exactly meet the threshold that they publicly touted to investors, including twelve consecutive quarters of at least 3.5% or 3.4% same property NOI growth.   The Audit Committee investigation forced Brixmor to revise the Company's Class Period same property NOI figures, including decreases significantly below this threshold during the market-sensitive periods shortly after the IPO.   ¶¶45-52.   The revisions were material in nature, including a manipulation as high as nearly 45%.   The nature and timing of these manipulations directly evince intentional misconduct on the part of the Individual Defendants, and support a strong inference of scienter.

184.   *The manner in which the "smoothing" scheme came to light supports scienter.* The Individual Defendants' fraud was not voluntarily reported, or corrected as a result of routine auditing.  Rather, a tip to the Company's audit alert line was the catalyst for an Audit Committee investigation that began in December 2015.  This investigation culminated less than two months later with the immediate resignations of the Individual Defendants, and an admission that Brixmor had manipulated its critical same property NOI figures.   The manner in which the scheme came to light, and the resulting immediate departures of the senior-most executives of the Company, thus suggests that the accounting manipulations did not occur by accident, but rather were the result of intentional, or at minimum, severely reckless, acts to falsely portray the Company's financial and operational results.

185.   *The Same Property NOI Manipulations Did Not Involve Complex Accounting Issues or Matters of Judgment*.  As Brixmor ultimately admitted, the quarter-end adjustments that the Individual Defendants made to publicly-reported same property NOI growth rates did not involve complicated accounting issues or difficult judgment calls.  To the contrary, each quarter the Individual Defendants would intentionally override the Company's internal controls and simply "adjust" same property NOI growth to the level they wished to report—a narrow range between 3.4% and 3.9%, and always in excess of 3.4%.  In essence, the Individual Defendants would simply make up a growth rate that they wished to report to investors, and given the segmented structure of Brixmor's accounting hierarchy, lower-level employees did not have the requisite visibility or access to detect the adjustments on a portfolio-wide level.

186.   *The responses of securities analysts further support an inference of scienter*.  Brixmor was closely followed by many securities analysts, including Wells Fargo Securities, SunTrust Robinson Humphrey, and KeyBanc Capital Markets, who met and spoke with the Company regularly.  In the wake of Brixmor's stunning disclosures at the end of the Class Period, these analysts, among others, questioned the credibility of Brixmor's prior management, including the Individual Defendants.

187.   For example, analysts at Wells Fargo Securities, who followed the Company for years and regularly met with management, downgraded the Company's rating from Outperform to Market Perform, and issued an analyst report explaining that the conduct "is inexcusable."  Analysts at SunTrust Robinson Humphrey, who had also been following the Company for years, stated that "over the past 2 years, [they] brought up questions regarding SSNOI a few times in [their] reports or questions to management in 1x1 meetings.  Particularly, on why/how SSNOI looked smooth while the components of SSNOI

were volatile." SunTrust noted that consistency was part of Brixmor's "story" or "thesis," and that "volatile" same property NOI results "could have been damaging to that thesis or image." SunTrust downgraded Brixmor from Buy to Neutral due to the accounting issues, and the "veil of uncertainty regarding the company's future, loss of credibility, and ability to raise capital."

188.   Analysts at KeyBanc Capital Markets denounced the minimization of the materiality of the same property NOI growth smoothing as "the Board's swift action implies otherwise." KeyBanc Capital Markets analysts discussed the "[s]hake up at the top," and that their reason for downgrading Brixmor stock was "that the CEO, CFO, CAO and an additional accounting employee have resigned following an Audit Committee review that uncovered a 'course of conduct' issue associated with BRX's financial reporting."

189.   *Brixmor's material weaknesses in internal controls were severe and pervasive.* As detailed above, the Company has admitted that there was "material weakness in our internal control over financial reporting and our management has concluded that our disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2015." Moreover, Brixmor admitted that "because of the override of controls that occurred at senior levels of management, we have concluded that the potential for material misstatement of the financial statements was more than remote. Accordingly, management has determined that this control deficiency constitutes a material weakness." The Company further acknowledged that "the override of controls . . . occurred at senior levels of management." The fact that Individual Defendants Carroll and Pappagallo certified the effectiveness of Brixmor's internal controls, while actively overriding such controls to perpetrate the fraud, is further evidence of their scienter.

## VIII.  **LOSS CAUSATION**

190.    Throughout the Class Period, the price of Brixmor's securities was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Brixmor securities, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Brixmor securities fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Brixmor securities during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

191.    By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Brixmor's business and prospects.  Defendants' false and misleading statements had the intended effect, and caused Brixmor securities to trade at artificially inflated levels throughout the Class Period, with Brixmor common stock reaching as high as $27.39 per share on January 19, 2015.  On the last trading day before Defendants' fraud was revealed, Brixmor common stock traded at $26.42 per share on Friday, February 5, 2016, the last day of the Class Period.

192.    Defendants' disclosures on Monday, February 8, 2016 revealed to the market the false and misleading nature of Defendants' statements and omissions.  On that day, Brixmor revealed several facts as described above, including that the Company had (i) manipulated its quarterly same property NOI figures throughout the Class Period; (ii) accepted the immediate resignations of the Individual Defendants and the Company's Senior Vice President of

Management Accounting; and (iii) identified a material weakness in its internal controls over financial reporting.

193.   In response to the Company's disclosures, the price of Brixmor securities precipitously declined.  On February 8, 2016, Brixmor's share price plummeted by over 20%, closing down $5.32 from $26.42 per share on Friday, February 5, 2016 to $21.10 per share on Monday, February 8, 2016, wiping out nearly $1.6 billion in market capitalization in one trading day, on unusually heavy trading volume of 21 million shares.

194.   The drastic decline in Brixmor's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX.   PRESUMPTION OF RELIANCE

195.   At all relevant times, the market for Brixmor's common stock was efficient for the following reasons, among others:

     a.    Brixmor's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

     b.    As a regulated issuer, Brixmor filed periodic reports with the SEC and the New York Stock Exchange;

     c.    Brixmor regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.     Brixmor was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

196.    As a result of the foregoing, the market for Brixmor's securities reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Brixmor's securities. All purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of Brixmor securities at artificially inflated prices, and a presumption of reliance applies.

197.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Brixmor's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

198.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Brixmor's current and historical NOI quarterly growth levels, its present financial condition, and

its internal controls over financial reporting, among others.  Further, the statutory safe harbor does not apply to statements included in financial statements that were prepared purportedly in accordance with GAAP, including Brixmor's quarterly reports on Form 10-Q, and annual reports on Form 10-K, issued during the Class Period.

199.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Brixmor's NOI quarterly growth levels and internal controls over financial reporting, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Brixmor were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

200.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Brixmor who knew that the statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

201.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the securities of Brixmor between February 20, 2014 and February 5, 2016, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and

directors of Brixmor at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

202.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Brixmor shares were actively traded on the New York Stock Exchange.  As of February 1, 2016, there were over 299 million shares of Brixmor common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class.  Class members who purchased Brixmor securities may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

203.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

204.    Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

205.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts, as alleged herein;

    b.    whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c.      whether Defendants acted with scienter; and

d.      the proper way to measure damages.

206.    A class action is superior to all other available methods for the fair and efficient

adjudication of this action because joinder of all Class members is impracticable.  Additionally,

the damage suffered by some individual Class members may be relatively small so that the

burden and expense of individual litigation make it impossible for such members to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

## XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act,
And SEC Rule 10b-5 Promulgated Thereunder
(Against Defendants Brixmor, Carroll, Pappagallo and Splain)**

207.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if

fully set forth herein.

208.    This Count is asserted on behalf of all members of the Class against Defendants

Brixmor, Carroll, Pappagallo and Splain for violations of Section 10(b) of the Exchange Act,

15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

209.    During the Class Period, Defendants disseminated or approved the false

statements specified above, which they knew were, or they deliberately disregarded as,

misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading.

210.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b)

made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of Brixmor securities during the Class Period.

211.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Brixmor securities, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Brixmor's operational metrics, its quarterly NOI growth, the Company's internal controls, and the Company's financial statements; (b) artificially inflate and maintain the market price of Brixmor securities; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's securities at artificially inflated prices, and to suffer losses when the true facts became known.

212.    Defendants Brixmor, Carroll, Pappagallo and Splain are liable for all materially false and misleading statements made during the Class Period, as alleged above.

213.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe

recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Brixmor securities, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

214.    Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Brixmor securities, which inflation was removed from its price when the true facts became known.  Lead Plaintiffs and the other members of the Class would not have purchased Brixmor securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

215.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Brixmor securities during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Carroll, Pappagallo and Splain)

216.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

217.    This Count is asserted on behalf of all members of the Class against Defendants Carroll, Pappagallo and Splain for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

218.    During their tenures as officers and/or directors of Brixmor, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶21-26.  By reason of their positions of control and authority as officers

78

and/or directors of Brixmor, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Brixmor during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

219.    In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶21-26, Defendants Carroll, Pappagallo and Splain had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.  Defendants Carroll, Pappagallo and Splain signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Brixmor during the Class Period.  Defendants Carroll, Pappagallo and Splain were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Brixmor during the Class Period. As a result of the foregoing, Defendants Carroll, Pappagallo and Splain, as a group and individually, were controlling persons of Brixmor within the meaning of Section 20(a) of the Exchange Act.

220.    As set forth above, Brixmor violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

221.    By virtue of their positions as controlling persons of Brixmor, and as a result of their own aforementioned conduct, Defendants Carroll, Pappagallo and Splain are liable pursuant

to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs, and the other members of the Class, who purchased or otherwise acquired Brixmor securities.  As detailed above in ¶¶21-26, during the respective times these Defendants served as officers and/or directors of Brixmor, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

222.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or other acquisition of Brixmor securities.

## XIII.  <u>PRAYER FOR RELIEF</u>

223.    WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a.    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## XIV.  <u>JURY DEMAND</u>

224.    Lead Plaintiffs hereby demand a trial by jury.

DATED: February 16, 2017          Respectfully Submitted,

*/s/ Steven B. Singer*

**SAXENA WHITE P.A.**

Steven B. Singer (SS-5212)
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611
ssinger@saxenawhite.com

-and-

Maya Saxena
Joseph E. White, III (JW-9598)
Lester R. Hooker
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile:  (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

***Lead Counsel for Lead Plaintiffs and the Class***

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

*/s/ Curtis V. Trinko*
Curtis V. Trinko (CT-1838)
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone: (212) 490-9550
Facsimile: (212) 986-0158
ctrinko@trinko.com

***Liaison Counsel for Lead Plaintiffs and the Class***

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, James D. Love, on behalf of the City of Birmingham Retirement and Relief System ("Birmingham"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am authorized in my capacity as Assistant City Attorney of Birmingham to initiate litigation and to execute this Certification on behalf of Birmingham.

2.  I have reviewed the Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") in this action and authorize the filing of the Complaint and this Certification or any substantively similar complaint or amended complaint to be filed in the future.

3.  Birmingham did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

4.  Birmingham is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

5.  Birmingham's transactions in Brixmor Property Group, Inc. common stock are set forth in the Schedule A attached hereto.

6.  Birmingham has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *In re BHP Billiton Limited Securities Litigation*, Case No. 1:16-cv-01445 (S.D.N.Y.)

7.  Birmingham has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

    *State-Boston Retirement System v. Infoblox, Inc. et al.*, Case No. 3:14-cv-02500 (N.D. Cal.)

    *City of Birmingham Retirement and Relief System v. Armstrong, et al.*, Case No. 1:16-cv-00017 (D. Del.)

    *Magro v. Freeport-Mcmoran, Inc., et al.*, Case No. 2:16-cv-00186 (D. Ariz.)

    *Boynton Beach Firefighters' Pension Fund v. HCP, Inc. et al.*, Case No. 3:16-cv-01106 (N.D. Ohio)

8.  Birmingham will not accept any payment for serving as a representative party on behalf of the Class beyond Birmingham's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of February 2017.

City of Birmingham Retirement and Relief System

James D. Love, Assistant City Attorney

**SCHEDULE A**
**The City of Birmingham Retirement and Relief System**
**Transactions in Brixmor Property Group, Inc.**
**Period:  February 20, 2014 through February 5, 2016**

**Beg. Hold.**        15,547

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 06/26/14 | 11,508 | $25.90 |
| 01/13/15 | 5,896 | $25.90 |
| 03/24/15 | 11,210 | $26.28 |
| 05/18/15 | 860 | $24.87 |
| 06/01/15 | 5,346 | $24.90 |
| 09/11/15 | 562 | $22.98 |
| 09/14/15 | 592 | $23.07 |
| 09/14/15 | 132 | $23.08 |
| 09/14/15 | 1,262 | $23.11 |
| 09/15/15 | 372 | $23.35 |
| 09/15/15 | 49 | $23.40 |
| 09/16/15 | 52 | $23.50 |
| 09/16/15 | 400 | $23.63 |
| 09/17/15 | 159 | $23.67 |
| 09/17/15 | 102 | $23.70 |
| 09/17/15 | 299 | $23.95 |
| 09/18/15 | 816 | $24.07 |
| 09/21/15 | 1,166 | $24.04 |
| 10/15/15 | 1,076 | $24.62 |
| 10/16/15 | 188 | $25.04 |
| 10/19/15 | 137 | $25.11 |
| 10/19/15 | 66 | $25.20 |
| 10/20/15 | 348 | $25.31 |
| 10/22/15 | 563 | $25.50 |
| 10/23/15 | 169 | $25.76 |
| 10/23/15 | 124 | $25.87 |
| 10/26/15 | 1,055 | $25.73 |
| 10/27/15 | 1,777 | $26.11 |
| 10/28/15 | 2,491 | $25.88 |
| 10/29/15 | 530 | $25.58 |
| 10/29/15 | 977 | $25.67 |
| 10/29/15 | 112 | $25.75 |
| 10/30/15 | 2,148 | $25.60 |
| 10/30/15 | 856 | $25.64 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |
| 06/27/14 | 100 | $22.73 |
| 05/08/15 | 1,406 | $23.58 |
| 06/11/15 | 10,563 | $23.73 |
| 09/22/15 | 1,009 | $23.82 |
| 12/23/15 | 815 | $25.68 |
| 12/24/15 | 439 | $25.64 |
| 12/28/15 | 782 | $25.60 |
| 12/28/15 | 615 | $25.70 |
| 12/29/15 | 418 | $25.86 |
| 12/29/15 | 1,145 | $25.92 |
| 12/29/15 | 375 | $26.02 |
| 12/30/15 | 519 | $25.97 |
| 12/30/15 | 1,305 | $25.98 |

*Post Class Period Sales*

| | | |
|---|---|---|
| 02/25/16 | 3,212 | $23.90 |
| 02/25/16 | 1,346 | $23.91 |
| 02/25/16 | 671 | $23.99 |
| 02/26/16 | 3,196 | $23.84 |
| 02/26/16 | 26 | $23.91 |
| 02/29/16 | 1,624 | $23.62 |
| 03/01/16 | 3,428 | $23.92 |
| 03/02/16 | 3,259 | $23.76 |

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, Christine Costa, on behalf of the Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Local 60"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.   I am authorized in my capacity as Fund Manager of Local 60 to initiate litigation and to execute this Certification on behalf of Local 60.

2.   I have reviewed the Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") in this action and authorize the filing of the Complaint and this Certification or any substantively similar complaint or amended complaint to be filed in the future.

3.   Local 60 did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

4.   Local 60 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

5.   Local 60's transactions in Brixmor Property Group Inc. common stock are set forth in the Schedule A attached hereto.

6.   Local 60 has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

7.   Local 60 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

   *Westchester Putnam County Heavy & Highway Laborers Local 60 Benefit Funds v. Aetna Inc. et al,* Case No. 3:17-cv-00113 (D. Conn.)

8.   Local 60 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 60's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _10_ day of February 2017.

Westchester Putnam Counties Heavy &
Highway Laborers Local 60 Benefit Funds

_Christine P. Costa_

Christine Costa, Fund Manager

**SCHEDULE A**
**Westchester Putnam Counties Heavy &**
**Highway Laborers Local 60 Benefit Funds**
**Transactions in Brixmor Property Group Inc.**
**Period: February 20, 2014 through February 5, 2016**

**Beg. Hold.**          0

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 10/26/15 | 1,622 | $25.80 |
| 10/26/15 | 1,360 | $25.80 |
| 10/27/15 | 1,637 | $26.24 |
| 10/27/15 | 1,372 | $26.24 |
| 11/02/15 | 2,727 | $25.70 |
| 11/02/15 | 3,253 | $25.70 |
| 11/03/15 | 1,349 | $25.80 |
| 11/03/15 | 1,609 | $25.80 |
| 11/04/15 | 1,647 | $25.85 |
| 11/04/15 | 1,381 | $25.85 |
| 11/05/15 | 3,155 | $26.04 |
| 11/05/15 | 2,644 | $26.04 |
| 01/19/16 | 1,309 | $25.58 |
| 01/19/16 | 1,098 | $25.58 |
| 01/25/16 | 1,438 | $25.72 |
| 01/25/16 | 1,205 | $25.72 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |
| 02/02/16 | 1,677 | $26.37 |
| 02/02/16 | 2,001 | $26.37 |

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, Andy Mackle, on behalf of the Teamsters Local 456 Annuity Fund ("Local 456"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am authorized in my capacity as Fund Manager of Local 456 to initiate litigation and to execute this Certification on behalf of Local 456.

2.  I have reviewed the Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") in this action and authorize the filing of the Complaint and this Certification or any substantively similar complaint or amended complaint to be filed in the future.

3.  Local 456 did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

4.  Local 456 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

5.  Local 456's transactions in Brixmor Property Group Inc. common stock are set forth in the Schedule A attached hereto.

6.  Local 456 has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

7.  Local 456 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending: *None*

8.  Local 456 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 456's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 10ᵀᴴ day of February 2017.

Teamsters Local 456 Annuity Fund

Andy Mackle, Fund Manager

**SCHEDULE A**
**Teamsters Local 456 Annuity Fund**
**Transactions in Brixmor Property Group Inc.**
**Period: February 20, 2014 through February 5, 2016**

**Beg. Hold.**        6,160

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 06/04/14 | 25 | $21.90 |
| 09/03/14 | 35 | $23.74 |
| 01/28/15 | 1,810 | $27.25 |
| 05/01/15 | 2,349 | $23.74 |
| 10/26/15 | 2,358 | $25.80 |
| 10/27/15 | 2,379 | $26.24 |
| 11/02/15 | 4,727 | $25.70 |
| 11/03/15 | 2,339 | $25.80 |
| 11/04/15 | 2,393 | $25.85 |
| 11/05/15 | 4,585 | $26.04 |
| 01/19/16 | 1,902 | $25.58 |
| 01/25/16 | 2,090 | $25.72 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 07/28/14 | 575 | $23.56 |
| 03/27/15 | 160 | $26.10 |
| 08/11/15 | 320 | $24.65 |
| 09/09/15 | 165 | $22.52 |
| 12/03/15 | 50 | $24.49 |
| 02/02/16 | 2,899 | $26.37 |

*Post CP Sales*

| | | |
|---|---|---|
| 02/19/16 | 250 | $23.44 |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 16, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

<u>*/s/ Curtis V. Trinko*</u>
Curtis V. Trinko